IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

JIMMY LEE CARTER,                      )
                                       )        No. C 02-0586 SBA (PR)
            Petitioner,                )
                                       )        **ORDER DENYING**
    v.                                 )        **PETITION FOR WRIT**
                                       )        **OF HABEAS CORPUS**
WILLIAM DUNCAN, Warden,                )
                                       )
            Respondent.                )
_____)

**INTRODUCTION**

This matter is now before the Court for consideration of Petitioner's <u>pro se</u> petition for writ of habeas corpus under 28 U.S.C. § 2254 concerning his 2000 conviction in Contra Costa County Superior Court. Warden William Duncan (hereinafter "Respondent") opposes the petition. For the reasons discussed below, the petition will be DENIED as to all claims.

**BACKGROUND**

I.      **Case History**

On January 21, 2000, Petitioner was convicted of petty theft with a prior conviction, and being an ex-felon in possession of a firearm and ammunition. A firearm allegation was also found to be true, therefore, Petitioner was subject to a one-year gun-use enhancement. He was sentenced on April 27, 2000 to a term of eight years and four months. He filed a direct appeal, which was denied by the California Court of Appeal in an unpublished opinion on September 28, 2001. <u>See</u> Resp't B-2. His petition for review to the California Supreme Court was denied on December 19, 2001. <u>See</u> Resp't C-2.

Petitioner filed the instant federal habeas corpus petition on February 1, 2002 (hereinafter "Orig. Pet.") asserting six claims. On February 15, 2002, the Court dismissed Petitioner's original petition with leave to amend because it appeared that three of his claims may not be exhausted. On March 13, 2002, Petitioner filed his first amended petition, in which he alleged he exhausted all of his claims. On April 25, 2002, the Court dismissed Petitioner's first amended petition because it contained at least one unexhausted claim and granted

Petitioner leave to file a second amended petition asserting only his exhausted claims.

On May 8, 2002, Petitioner filed a second amended petition, asserting two claims: (1) that the prosecutor in his state case (hereinafter "Prosecutor") improperly used peremptory challenges for a discriminatory purpose, in violation of the United States Constitution as set forth in Batson v. Kentucky, 476 U.S. 79 (1986) (Claim One) and (2) the trial court failed to excuse a juror for cause, in violation of Petitioner's Sixth Amendment rights (Claim Two). Respondent opposes the petition in his Answer and his Memorandum of Points and Authorities in Support of the Answer to Petition for Writ of Habeas Corpus (hereinafter "Answer"), both filed on August 8, 2002 (docket nos. 12, 13). Petitioner filed a traverse on September 18, 2002 (hereinafter "Traverse") (docket no. 17 ).

In an Order dated March 20, 2003, the Court reconsidered whether the claims raised in Petitioner's original petition were exhausted in state court, in light of the Ninth Circuit Court of Appeals's decision in Peterson v. Lampert, 319 F.3d 1153 (9th Cir. 2003) (en banc). The Court had previously concluded that three claims in Petitioner's original petition were unexhausted because he had only cited California cases in support of those claims. In Peterson, the Ninth Circuit held that citation of state cases applying federal law could be sufficient to fairly present a federal claim in state court proceedings. 319 F.3d at 1158. The Court consequently found that the three claims were exhausted in light of Peterson. Therefore, upon finding that Claims One through Five were fully exhausted and that Claim Six was unexhausted, the Court granted Petitioner leave to file a third amended petition asserting Claims One through Five from his original petition (docket no. 25).

Petitioner filed his third amended petition on April 11, 2003 (docket no. 26). In addition to the two previous claims that the Court found cognizable, Petitioner asserted the other three claims from his original petition: (1) that his federal due process rights were violated by a suggestive photographic lineup (Claim Three) and (2) that insufficient evidence supported the jury's findings that he possessed a firearm and ammunition (Claims Four and Five). Respondent also opposes Petitioner's three additional claims in his Amended Answer and his Supplemental

2

United States District Court

For the Northern District of California

1    Memorandum of Points and Authorities in Support of the Answer to Petition for Writ of Habeas

2    Corpus (hereinafter "Suppl. Answer"), both filed on July 9, 2003 (docket nos. 35, 36).

3    Petitioner filed a "Traverse and Supplemental Answer to Respondent" (hereinafter "Suppl.

4    Traverse") on April 23, 2004 (docket no. 43).

5         In an Order dated May 3, 2005, the Court found that Petitioner fulfilled the exhaustion

6    requirement as to Claim Six of his original petition -- that the trial court erred in excluding

7    evidence of third-party culpability in violation of his due process rights.[1]   Therefore, the Court

8    ordered Respondent to show cause why the writ should not issue as to Claim Six (docket no.

9    44).

10        Respondent filed a Second Amended Answer and a Second Supplemental Memorandum

11   (hereinafter "Second Suppl. Answer"), both filed on June 1, 2005 (docket nos. 45, 46).

12   Petitioner did not file a traverse, instead, he filed a "Motion to Dismiss" (hereinafter "Second

13   Suppl. Traverse"), on June 30, 2005 (docket no. 47).  The matter has been fully briefed and is

14   now ready for review on the merits.

15   **II.   Facts**

16        The following facts are drawn from the appellate opinion.

17        On April 28, 1999, Patricia Turner was working as a checker at the
18        Foodsco [sic][2] store in Richmond.  She saw [Petitioner], dressed in bulky
         clothing, enter the store for the second time that day.  Turner had seen [Petitioner]
19       in Foodsco [sic] on several other occasions and remembered that he had a glass
         eye and [a] facial scar.  She called the manager, Ibrahim Alwareeth, to alert him
20       to [Petitioner's] presence.

21        Alwareeth had seen [Petitioner] two other times in the store and knew him
22       as someone who shoplifted.  He was also aware that [Petitioner] had a glass eye
         and [a] facial scar.  Alwareeth saw [Petitioner] go to the candy aisle and asked
23       clerk Herbert Halcrombe to watch him.

24
         _____

25        [1]  In its March 20, 2003 Order, the Court stated that Claim Six was unexhausted.  However,
         on May 3, 2005, the Court conducted another review of his petition for review to the California
26       Supreme Court and determined that Petitioner had clearly mentioned a violation of his federal due
         process rights to a fair trial with respect to Claim Six.  See May 3, 2005 Order at 1-2.  Therefore, the
27       Court found that Petitioner had exhausted his state judicial remedies as to this claim.  Id. at 2.

28        [2]  The appellate court incorrectly used the name "Foodsco" for the location of this incident.
         The correct name is "Foods Co."

Halcrombe recognized [Petitioner] because he had seen him in the store five to ten times. He knew that [Petitioner] had a scar on his face and a problem with his eye. Halcrombe called security after he saw [Petitioner] put something in his jacket. John Bailey, the security guard, detained [Petitioner] as he left the store. When Bailey patted [Petitioner's] jacket, [Petitioner] said, "Well, you got me."

Bailey took [Petitioner] to the employees' break room and removed eight or ten large candy bars from [Petitioner's] jacket. Bailey left to get paperwork, leaving Alwareeth with [Petitioner] in the room. Halcrombe stood outside the door. [Petitioner] yelled that he had to leave. When Alwareeth refused to let him go, [Petitioner] pulled a gun from behind his back. [Petitioner] pointed the gun five inches from Alwareeth's face and yelled, "Get out of my way or I'll give you this." As [Petitioner] ran from the room, he stuck the gun in Halcrombe's chest and yelled, "Get out of my way." [Petitioner] then encountered Bailey. He stuck the gun in Bailey's chest and demanded that he too get out of the way. [Petitioner] walked backwards out the store, waiving the gun in the air. Once outside [Petitioner] jumped on his bicycle and rode away.

Two days later Alwareeth and a police detective viewed a surveillance tape from the bank located inside Foodsco [sic]. The videotape showed Bailey walking with [Petitioner] at which point Alwareeth stated, "That's the guy." [Petitioner] was arrested on May 6, 1999. Alwareeth and Turner both identified [Petitioner] from a photo lineup.

A search of [Petitioner's] studio apartment revealed 45 rounds of .22 caliber ammunition on the floor of a closet. The closet contained both men and women's clothing. The detective also found 16 rounds of .308 caliber rifle ammunition in the living area.

At the conclusion of the defense case, the court granted [Petitioner's] motion for acquittal of assault with a firearm. The jury convicted [Petitioner] of petty theft with a prior conviction and [the gun-use] enhancement, as well as possession of a firearm and ammunition by a felon.

The court found that [Petitioner] had suffered a prior strike conviction and sentenced [Petitioner] to a total prison term commitment [of] eight years, four months.

People v. Carter, No. A091231, slip op. at 1-2 (Cal. Ct. App. Sept. 28, 2001) (Resp't Ex. B-2).

## DISCUSSION

### I.   Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a district court may grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court only if the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2)

resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the [s]tate court proceeding."  28 U.S.C. § 2254(d).

"Clearly established federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of the [Supreme] Court's decisions as of the time of the relevant state court decision."  Williams (Terry) v. Taylor, 529 U.S. 362, 412 (2000); Lockyer v. Andrade, 538 U.S. 63, 71 (2003); Alvarado v. Hill, 252 F.3d 1066, 1068-69 (9th Cir. 2001).  Section 2254(d)(1) "restricts the source of clearly established law to the [Supreme] Court's jurisprudence."  Williams, 529 U.S. at 412.

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the [Supreme] Court on a question of law or if the state court decides a case differently than the [Supreme] Court has on a set of materially indistinguishable facts."  Id. at 413.  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id. at 412-13.

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant [s]tate court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411.  The objectively unreasonable standard is not a clear error standard.  See Andrade, 538 U.S. at 63 (rejecting the Ninth Circuit's use of clear error standard in Van Tran v. Lindsey, 212 F.3d 1143 (9th Cir. 2000)).  After Andrade, "[t]he writ may not issue simply because, in our determination, a [s]tate court's application of federal law was erroneous, clearly or otherwise."  Id. at 75-76.  While the 'objectively unreasonable' standard is not self-explanatory, at a minimum "it denotes a greater degree of deference to the state courts than [the Ninth Circuit] ha[s] previously afforded them."  Id. at 75.

A federal habeas court may also grant the writ if it concludes that the state court's adjudication of the claim "resulted in a decision that was based on an unreasonable

5

determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(2).  A district court must presume correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  This presumption is not altered by the fact that the finding was made by a state court of appeals, rather than by a state trial court.  See Sumner v. Mata, 449 U.S. 539, 546-47 (1981); see also Bragg v. Galaza, 242 F.3d 1082, 1087 (9th Cir. 2001), amended by 253 F.3d 1150 (9th Cir. 2001).

Where, as here, the California Supreme Court denies review of Petitioner's claim without explanation, the Court looks to the last reasoned state court decision in conducting habeas review.  See Shackleford v. Hubbard, 234 F.3d 1072, 1079 (9th Cir. 2000) (citation omitted), cert. denied, 534 U.S. 944 (2001) (the district court "looks through" the unexplained California Supreme Court decision to the last reasoned state court decision).  In the instant case, the California Court of Appeal rendered the last reasoned state court decision.

Habeas relief is warranted only if the constitutional error at issue is structural error or had a "substantial and injurious effect or influence in determining the jury's verdict."  Penry v. Johnson, 532 U.S. 782, 795 (2001) (quoting Brecht v. Abrahamson, 507 U.S. 619, 638 (1993)).  Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in "actual" prejudice.  Brecht, 507 U.S. at 637.

**II.   Exhaustion**

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court.  See 28 U.S.C. § 2254(b), (c); Granberry v. Greer, 481 U.S. 129, 133-34 (1987).  It is undisputed that Petitioner exhausted his state court remedies as to the claims raised in this proceeding.  See supra Background, Part I.

6

United States District Court

For the Northern District of California

III.    **Legal Claims**

    A.    **The *Batson* Standard**

        1.    **Background**

Petitioner claims that the Prosecutor's reasons for raising peremptory challenges against four African-American prospective jurors[3] was a pretext for race discrimination, in support of his Equal Protection claim under the <u>Batson</u> standard.  Orig. Pet.[4] at 8.  The four challenged prospective jurors were:  Devona Anderson, an African-American female (hereinafter "Anderson"), Steven Puckett, an African-American male (hereinafter "Puckett"); Steven Johnson, an African-American male (hereinafter "Johnson"); and Janice Cooper-Anderson, an African-American female (hereinafter "Cooper-Anderson").  <u>Id.</u>  Petitioner also argues that the Prosecutor improperly made a peremptory challenge against prospective juror Christopher Lewis (hereinafter "Lewis"), an African-American described as a "cross dresser/transvestite," based on sexual orientation.[5]  <u>Id.</u>

        2.    **Applicable Federal Law**

The Equal Protection Clause of the Constitution forbids challenging potential jurors solely on account of their race.  <u>See</u> <u>Batson</u>, 476 U.S. at 89; <u>see also</u> <u>J.E.B. v. Alabama ex rel. T.B.</u>, 511 U.S. 127, 130 (1994).  A party may raise an equal protection claim on behalf of a

---

[3]  In evaluating Petitioner's <u>Batson</u> claim, Respondent notes:

[T]he prosecutor did not challenge two blacks who sat on the jury.  Nor did he challenge the two Hispanics who also remained on the jury.  RT 595; 722-723.  While not dispositive, a prosecutor's acceptance of black jurors is relevant in determining his intent in excusing others.

Answer at 9 (citing <u>Palmer v. Estelle</u>, 985 F.2d 456, 458 (9th Cir. 1993)).

[4]  For the purposes of this Order, the Court will cite to Petitioner's original petition when ruling on the merits of his petition.  The Court will consider Petitioner's arguments for Claims One through Six in his original petition, which was reconsidered by the Court in its March 20, 2003 and May 3, 2005 Orders.  <u>See</u> <u>supra</u> Background, Part I.

[5]  The Court notes that the record indicates that "on the day [Lewis] appeared in court for jury duty he dressed as a woman."  Resp't Ex. B-2 at 11.

United States District Court
For the Northern District of California

juror regardless of whether the party and the excluded juror share the same race.  See Powers v. Ohio, 499 U.S. 400, 406 (1991).

As part of its Batson analysis, the Supreme Court applies a three-step process for evaluating claims involving a Prosecutor using peremptory challenges in an allegedly unconstitutional manner.  See Hernandez v. New York, 500 U.S. 352, 358 (1991); Batson, 476 U.S. at 96-97.  "First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race."  Hernandez, 500 U.S. at 358.  To establish a prima facie case, Petitioner must show that (1) the prospective juror who was removed is a member of a cognizable group, (2) the prosecutor exercised a peremptory challenge to remove the juror, and (3) "the facts and any other relevant circumstances raise an inference" that the challenge was motivated by race.  Cooperwood v. Cambra, 245 F.3d 1042, 1046 (9th Cir. 2001).  However, if the trial court ruled on the ultimate question of intentional discrimination, a federal habeas court does not need to dwell on the first step because "the preliminary issue of whether the defendant has made a prima facie showing becomes moot."  Hernandez, 500 U.S. at 359.  "Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race neutral explanation for striking the jurors in question."  Id. at 358-59.  The prosecutor cannot meet this burden through "mere general assertions," but must demonstrate that "permissible racially neutral selection criteria and procedures have produced the monochromatic result."  Batson, 476 U.S. at 94.  "Finally, the trial court must determine whether the Defendant has carried his burden of proving purposeful discrimination."  Id. at 98; see also Hernandez, 500 U.S. at 359; Wade v. Terhune, 202 F.3d 1190, 1195 (9th Cir. 2000).

To fulfill its duty, the trial court must evaluate the prosecutor's proffered reasons and credibility under the totality of the relevant facts, using all the available tools including its own observations and the assistance of counsel.  See Mitleider v. Hall, 391 F.3d 1039, 1047 (9th Cir. 2004); see also Lewis v. Lewis, 321 F.3d 824, 831 (9th Cir. 2003).  The trial court must proceed to this third step and determine whether there was intentional discrimination, even in the absence of further request from counsel.  United States v. Alanis, 335 F.3d 965, 968 (9th Cir.

2003).

In evaluating the prosecutor's explanation of race neutrality, proof of discriminatory intent or purpose, and not merely disproportionate impact, is required to show a violation of the Equal Protection Clause. See Hernandez, 500 U.S. at 355-62 (no discriminatory intent where Latino jurors dismissed because of possible difficulty in accepting translator's rendition of Spanish language testimony). In addition, the findings of the trial court on the issue of discriminatory intent are entitled to "great deference" because "evaluation of the prosecutor's state of mind based on demeanor and credibility lies peculiarly within a trial judge's province." Id. at 364-65 (quoting Wainwright v. Witt, 469 U.S. 412, 428 (1985)). Therefore, the trial court's conclusion is not to be reversed unless it is found to be "clearly erroneous." Hernandez, 500 U.S. at 369.

The findings of the trial court on the issue of discriminatory intent are findings of fact entitled to the presumption of correctness in federal habeas review. See Purkett v. Elem, 514 U.S. 765, 769 (1995). So are the findings of the appellate court.[6] See Kesser v. Cambra, 392 F.3d 327, 341 (9th Cir. 2004) ("That a state appeal court, as opposed to a state trial court, makes the pertinent factual finding does not alter § 2254(e)(1)'s presumption of correctness or a petitioner's burden of proof."); see also Williams v. Rhoades, 354 F.3d 1101, 1108 (9th Cir. 2004). But a federal district court is not bound by any state court fact findings when such findings are either unsupported in the record or refuted by it. See Johnson v. Vasquez, 3 F.3d 1327, 1331 (9th Cir. 1993) (reversing and remanding denial of writ because there was insufficient support in record that black juror was removed for other than racial reasons), cert. denied, 511 U.S. 1085 (1994); see, e.g., McClain v. Prunty, 217 F.3d 1209, 1221-23 (9th Cir.

---

[6] The Ninth Circuit has opined in dicta that, unlike a trial court, a court of appeal is not in an ideal position to conduct a step-three evaluation. Lewis, 321 F.3d at 832. But even Lewis acknowledged that a court of appeal is in a good position to use the trial court's findings and the evidence on the record to evaluate the support on the record for the prosecutor's reasons and credibility, and to compare the struck and empaneled jurors. Id.; accord Mitleider, 391 F.3d at 1050 (affording presumption of correctness to state appellate court's finding that prosecutor's proffered reasons and actual motives for challenging the juror were race-neutral).

2000) (trial court's decision that defendant did not meet his burden of proving intentional discrimination was based on an unreasonable determination of the facts in light of evidence at trial that showed the prosecutor's stated reasons for striking jurors were factually wrong, pretextual, or nonsensical).

### 3.   **Analysis**

The appellate court reviewed Petitioner's "Wheeler/Batson"[7] claim in an unpublished opinion.  According to the appellate court:

> [Petitioner] made two motions challenging the prosecutor's use of peremptory challenges to excuse African-American jurors.  The first motion was made after the prosecutor had excused four African-American jurors.  The court concluded there was a prima facie showing the challenges were based on race.  After hearing the prosecutor's explanations and defense counsel's responses, the court was persuaded that the prosecutor had not acted because of racial bias.  [Petitioner's] second motion occurred after the prosecutor excused an African-American juror who was also described by the court as a "cross dresser" and "transvestite."  The court again determined that the prosecutor had not challenged the juror because of his race and further that cross dressers or transvestites are not a cognizable group.  [Petitioner's] actual jury included two African-Americans.  [Petitioner] now contends the trial court erred in denying his motions, additionally claiming on

---

[7]   In People v. Wheeler, 22 Cal. 3d 258 (1978), the California Supreme Court established a procedure and an evidentiary burden for raising a racial discrimination claim, which are comparable to those later adopted in Batson.  Compare Wheeler, 22 Cal. 3d at 280, with Batson, 476 U.S. at 96.  The Ninth Circuit has held that "a Wheeler motion is the procedural equivalent of a Batson challenge in California."  Paulino v. Castro, 371 F.3d 1084, 1088 (2004).  Although the requirements for establishing a prima facie case of discrimination differ between Wheeler and Batson, the two cases are the same for purposes of habeas analysis under the AEDPA when the prima facie case requirement is not at issue.  See Collins v. Rice, 348 F.3d 1082, 1086 (9th Cir. 2003).

In the instant case, Petitioner's defense counsel (hereinafter "Defense Counsel") brought several motions under Wheeler, claiming that the Prosecutor had impermissibly exhibited racial discrimination in the exercise of his peremptory challenges.  The trial court ruled on the ultimate question of intentional discrimination as to each of Petitioner's racial discrimination claims, therefore, the prima facie requirement was not at issue in any of these claims.  See infra Parts III.A.3a-d.  Accordingly, the Court will refer to Petitioner's racial discrimination claims as Batson claims and Defense Counsel's Wheeler motions as Batson motions because both are the same for the purposes of the Court's habeas analysis.  See Collins, 348 F.3d at 1086.  The Court will analyze each of Petitioner's Batson claims by determining whether Petitioner has or has not rebutted the presumption of correctness afforded to the trial court's rulings on "the ultimate question of intentional discrimination."  See Hernandez, 500 U.S. at 359.

10

appeal that Lewis was excused because of his sexual orientation.

Resp't Ex. B-2 at 3.  The appellate court noted that in denying Petitioner's motion the trial court:

> . . . expressed its concern that "it just so happens that all of the African-Americans go off this jury because they're not supervisors, or they work for the postal service."  The court took the matter under submission, telling the prosecutor: "What I'm concerned about is if you set up criteria, [], which on its face [appears] to be race neutral -- you want people who have experience with making decisions on their job, supervisors preferably -- and that seems to be on its face a very acceptable way to select a jury, no question about it . . . .["]
>
> . . . .
>
> "You certainly put forward race-neutral reasons for excusing these people. . . .  But I'm concerned about the fact that an experienced prosecutor can always come up with a number of reasons that on their face appear to be race-neutral, but underlying it all, there is a desire to get rid of African-Americans. That happens."
>
> The next day the court again expressed its concern that four of the prosecutor's eight challenges were used against African-American jurors. However, the court advised that it had analyzed the prosecutor's reasons and concluded, "I have a hard time not accepting those reasons."

Id. at 4-5.  In analyzing the trial court's ruling, the appellate court stated:

> The record here amply supports a sincere and reasoned effort by the [trial] court to determine whether the justifications offered by the prosecutor were genuine.  After hearing arguments the court then took the matter under submission.  The next day, after having done further research, the court advised counsel that it understood "under the *Wheeler* case, trial courts have the obligation to explore and determine the real motives and reasons behind the prosecutor's peremptory challenges after [the] motion has been made."  The court asked additional questions regarding the prosecutor's challenges and listened thoughtfully to defense counsel's responsive arguments.  As to each of the first four challenged jurors, the [trial] court discussed its reasons for accepting the truthfulness of the prosecutor's justifications.

Id. at 10.  Therefore, the appellate court rejected Petitioner's claims upon finding that: (1) the reasons given by the Prosecutor for challenging prospective jurors Anderson, Pukett, Cooper-Anderson and Johnson were "plausible" and "substantial evidence support[ed] the court's determination that the prosecutor did not act with discriminatory intent," and (2) substantial evidence supported the determination that the Prosecutor's challenge of prospective juror Lewis was not based on race because "substantial evidence supports that determination," furthermore, "[n]o case has yet recognized cross-dressers as a cognizable group."  Id. at 10-11.

The appellate court found no error in the trial court's decision to deny Petitioner's Batson

11

**United States District Court**
For the Northern District of California

1  motions.  A review of the proffered justifications for the peremptory challenges against the

2  challenged jurors establishes that the appellate court's determination of Petitioner's <u>Batson</u> claim

3  was not contrary to, or an unreasonable application of, federal law.  <u>See</u> 28 U.S.C. § 2254(d).

a.      **Prospective Juror Anderson**

4  Petitioner argues that the Prosecutor's explanation for using a peremptory strike on

5  prospective juror Anderson was a pretext for racial discrimination.  Orig. Pet. at 8.

6  As part of Petitioner's <u>Batson</u> motion, the trial court applied the three-step process as set

7  out in <u>Batson</u>.  In order to establish a prima facie case, the trial court found that: (1) prospective

8  juror Anderson was an African-American and, therefore, from a cognizable group; (2) the

9  Prosecutor used his peremptory strike against Anderson; and (3) Petitioner had established that

10 the relevant facts gave rise to an inference of discriminatory purpose that the challenge was

11 motivated by race.  <u>See</u> <u>Cooperwood</u>, 245 F.3d at 1047-48 (quoting <u>Batson</u>, 476 U.S. at 96); <u>see</u>

12 <u>J.E.B.</u>, 511 U.S. at 144-45.  The trial court requested the Prosecutor to come forward with an

13 explanation for the challenge, the second step of the <u>Batson</u> challenge.

14 The prosecutor explained his reasons for excusing Anderson as follows:

> She's been at her job for two months, indicated to the court that she had a
> financial hardship. She just started this job, did not want to be here, was very
> concerned about her new job.  She's single, does not have a stake in the
> community.  She still lives with her parents who still give her financial support.
> She's not financially independent in and of herself.  I believe a good thoughtful
> juror in this case at her age would be someone who is in a supervisory position,
> working to, at least, where they can support in [sic] themselves.  And I'm also
> very concerned about her worries about financial hardship, just starting a new
> job.

RT 343.

15 The Prosecutor also noted that after he excused Anderson, she appeared to be

16 relieved and said, "thank you."  RT 343.  The Prosecutor explained that a juror "may

17 take it out" on the prosecution when serving on a jury causes financial hardship, because

18 the prosecution is responsible for bringing the case.  RT 344.

19 The appellate court noted that the trial court addressed the Prosecutor's reasons

20 for challenging Anderson:

12

> Regarding Anderson, the court addressed the prosecutor's concern as to her financial hardship and that she was living with her parents.  The court stated it would not second-guess the prosecutor's belief that someone Anderson's age should be "out on their own" and added its observation that Anderson was "quite relieved and very happy" when she was excused.

Resp't Ex. B-2 at 5.

Upon considering the Prosecutor's challenge to Anderson, the trial court completed the third step of the <u>Batson</u> analysis by finding that the reasons given by the Prosecutor were "race neutral."

In affirming the trial court's denial of Petitioner's <u>Batson</u> motion regarding prospective juror Anderson, the appellate court found that the reasons given by the Prosecutor were race neutral.  The appellate court found that "substantial evidence support[ed] the court's determination that the prosecutor did not act with discriminatory intent as to [Anderson]."  Resp't Ex. B-2 at 10.

The Court's review of the record confirms that the state courts' determination of Petitioner's <u>Batson</u> claim involving prospective juror Anderson was not contrary to, or an unreasonable application of, federal law.  <u>See</u> 28 U.S.C. § 2254(d).  The findings of the trial and appellate court on the issue of discriminatory intent are findings of fact entitled to the presumption of correctness in federal habeas review.  <u>See</u> <u>Purkett</u>, 514 U.S. 765 at 769; <u>Williams</u>, 354 F.3d at 1108 (affording presumption of correctness to state appellate court's finding that trial court's unclear/ambiguous ruling was proper application of third <u>Batson</u> step).  Petitioner has not provided any support to rebut the state courts' conclusion that his <u>Batson</u> claim as to prospective juror Anderson lacks merit.  <u>See</u> <u>Burks v. Borg</u>, 27 F.3d 1424, 1429 (9th Cir. 1994).  Taken at face value, the Prosecutor's reasons did not appear to be a pretext for racial discrimination because his stated reason suggests that he believed the impact of Anderson's financial hardships and reluctance in serving on a jury might lead her to be prejudiced against the prosecution.  <u>See</u> <u>United States v. Echavarria-Olarte</u>, 904 F.2d 1391, 1395 (9th Cir. 1990) (not improper to excuse juror for financial hardship); <u>see also</u> <u>Burks</u>, 27 F.3d at 1426 (not

13

improper to dismiss juror based on reluctance to serve).

The Court finds that the appellate court reasonably concluded that the Prosecutor's peremptory challenge against Anderson was devoid of impermissible discriminatory motive.

Accordingly, Petitioner is not entitled to habeas relief as to his claim of the Prosecutor's illegal use of a peremptory challenge against prospective juror Anderson.

### b.    Prospective Jurors Puckett and Johnson

Petitioner further argues that the Prosecutor's race-neutral reason for using a peremptory challenge was a pretext for discriminatory intent as to both prospective jurors Puckett and Johnson.  Orig. Pet. at 8.

The Court finds that the record also supports a finding that the Prosecutor's reasons for challenging Puckett and Johnson were race-neutral and not pretextual.  To establish a prima facie case, the trial court found: (1) prospective jurors Puckett and Johnson were of African-American ancestry and were, therefore, from a cognizable group; (2) the Prosecutor used his peremptory strike to remove them; and (3) Petitioner had established that the relevant facts gave rise to an inference of discriminatory purpose that both challenges were motivated by race.  See Cooperwood, 245 F.3d at 1047-48 (quoting Batson, 476 U.S. at 96); see also J.E.B., 511 U.S. at 144-45.  The court requested that the Prosecutor come forward with explanations for both challenges.  As for prospective juror Puckett, the prosecutor stated:

> [N]umber one, he works for the post office.  As a matter of course, I do not like employees from the United States Post Office sitting on my juries.  I know it's odd.  We all have our weird quirks.  Or letter carriers from the United States Post Office.  It's a job that is not a supervisory position.  It's [a] job of just delivering letters.  There's a lot of stuff in the press about disgruntled postal workers.  I found through my experience as a district attorney in this county that often times they are disgruntled, do not get along with other jurors.  [¶]  In addition, I asked the court to specifically question him to some of the confusing things that were on his yellow sheet that he had.  He indicated he was in law enforcement.  He was in the military.  When asked in open court, before we asked him that question if he had any friends or family members, he did not readily volunteer that he had been an officer, so to speak, in law enforcement in the military.  That concerned me because it shows an indication that he has some -- I don't know if

14

it's a bitterness.  But there's something about law enforcement[8] that I read him as not liking.  [¶]  When the court asked him if he had any family members in law enforcement, he briefly -- he first said no.  Then he briefly told us he had nephews and made it very clear to the court that he never talks to his own nephews who are in law enforcement.  That concerns me: either he's lying or he doesn't talk to them because they are in law enforcement.  [¶]  Furthermore, when the court asked him point blank about his law enforcement experience, he said, "I never wanted to be a police officer," or something to that effect, in a manner that troubles me, that he has some sort of disdain for police officers as a profession.  [¶]  In addition, we asked him of his prior jury services, and he indicated that it resulted in a change of plea.  The courts tried to engage him in some candor about that, and he said -- I quote -- the defendant didn't feel that he got a fair shake.  Not that the defendant was guilty, but he said . . . the defendant felt he did not get a fair shake.  That concerns me because it indicates somebody who sympathizes with the defendant, puts himself in the defendant's shoes, and I think that's a valid reason to kick anybody off, regardless of his race.  It is something that does concern me, and those are all borne out by the record.

Answer at 10 (citing RT 344-346) (footnote renumbered).

The Prosecutor explained his reasons for excusing prospective juror Johnson as follows:

Again, he's a United States UPS supervisor.  I do not like post office employees, and that usual[ly] extends to UPS as well.  I don't care what color they are, what race they are, it's personal preference.  Just like many D.A.'s don't like teachers or don't like engineers.  And there are many of us who also don't like people who work for the Post Office.  [¶]  In addition, what further troubled me is when we talked about the prior jury service, he served on a prior jury on a D.U.I. and told the court that he had been on a hung jury.  Obviously, that is the reason we ask those questions is because it's something attorneys look at when trying to base a decision on whether to keep somebody or not.  The fact that they were on a jury who was unable to reach a decision indicates either Mr. Johnson could not get along with somebody else, somebody else couldn't get along with Mr. Johnson and they did not come to a verdict.  That's why we ask these questions.  We don't ask them if it's a not guilty, but we ask them about hung juries mainly because attorneys like to know if they have a decision-maker sitting there, or they have somebody who didn't make a decision.

RT 346-347.

The appellate court noted that the trial court addressed the Prosecutor's reasons for challenging Puckett and Johnson:

As to Puckett, the court stated, "I was concerned at first when Mr. Puckett was excused.  He did not appear to me to have any serious defects as a juror.  He seemed to be a fairly middle-class individual, working individual, responsible

---

[8]  Puckett stated that he had once been empaneled on a jury, but that the defendant "didn't think he'd get a fair shake" and "cop[ped] a plea." RT 249.  When asked if he had any friends or relatives in law enforcement, Puckett stated:  "Not really.  I have, like, a nephew I never see.  He's a detective.  And another nephew's a sheriff, and his wife's a sheriff.  But I never see them."  RT 250.

15

United States District Court

For the Northern District of California

individual in the community.  But [the prosecutor] has pointed out that he has. . . a bias against people working in the post office, as far as sitting as jurors."  The court had earlier advised counsel that it found no law preventing attorneys from excluding members of certain professions.  The court expressed reservation as to the prosecutor's concern about Puckett's lack of supervisory experience, noting that the majority of jurors are probably not supervisors.  However, the court agreed with the prosecutor that Puckett had not been forthcoming about his own background in law enforcement with the military.  The court stated, "I got the feeling in reviewing and thinking about what he said that he was a little bit ashamed to have been associated with law enforcement.  Rightly or wrongly.  I would, as a prosecuting attorney, be a little bit concerned about somebody who was ashamed of their training."  The court also noted that the prosecutor found "significant" Puckett's remarks about his earlier jury service and concluded that the reasons given by the prosecutor for excluding Puckett were race-neutral.

. . . .

As to Johnson, the court stated that it was "very troubled" by the prosecutor's use of a peremptory challenge.  However, the court concluded that "the law supports you to one extent," citing *People v. Turner* (1994) 8 Cal.4th 137, 170, in which the Supreme Court determined that a juror's experience of sitting on a hung jury "constitutes a legitimate concern for the prosecution, which seeks a jury that can reach a unanimous verdict."

Resp't Ex. B-2 at 5-6.

Petitioner argues that the Prosecutor's challenges to Puckett and Johnson based on their employment was not valid.   The appellate court noted that Petitioner cited "no controlling case authority prohibiting prosecutors from exercising a peremptory challenge based on a panel member's employment status."  Id. at 9.  In finding that Petitioner's argument lacked merit, the appellate court stated:

[Petitioner] neglects to include the [trial] court's conclusion: "Notwithstanding what we have stated, we find that the prosecuting attorney's reasons . . . constitute a racially neutral explanation. . . ."  (*Ibid.*)  We also observe that neither Puckett nor Johnson was challenged solely because of their employment.  The court agreed with the prosecutor that Puckett had not been forthcoming about his law enforcement background, suggesting some reservation about that experience.  As to Johnson, the [trial] court, relying on *People v. Turner*, *supra*, 8 Cal.4th at page 170, properly noted that Johnson's previous experience on a hung jury was a valid basis for his excusal.

Id.  Therefore, the appellate court rejected Petitioner's Batson claims as to prospective jurors Puckett and Johnson.  The appellate court found that there was sufficient evidence on the record to support the trial court's ruling that the Prosecutor's challenges as to Puckett and Johnson were not based on their race, but on other race-neutral considerations.  Id. at 10.

16

United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The Court finds that the appellate court's determination -- that the trial court did not abuse its discretion in denying Petitioner's Batson motions regarding prospective jurors Puckett and Johnson -- was not contrary to, or an unreasonable application of, clearly established federal law. See LaJoie, 217 F.3d at 669 n.7.   The findings of the trial and appellate court on the issue of discriminatory intent are findings of fact entitled to the presumption of correctness in federal habeas review.  See Purkett, 514 U.S. 765 at 769; Williams, 354 F.3d at 1108. Petitioner has not provided any support to rebut the appellate court's findings.  See Burks, 27 F.3d at 1429.  Taken at face value, the Prosecutor's reasons did not appear to be mere proxies for racial discrimination because his stated reasons of challenging Puckett and Johnson were race neutral.  See id.  The Prosecutor's explanation need not be persuasive, or even plausible; unless a discriminatory intent is inherent in the Prosecutor's explanation, the reason offered will be deemed race neutral.  See United States v. Romero-Reyna, 889 F.2d 559, 560-61 (5th Cir. 1989) (upholding peremptory strike based upon counsel systematically striking all potential jurors whose occupations began with the letter "P"); United States v. Ruiz, 894 F.2d 501, 506 (2d Cir. 1990) (upholding peremptory challenge based on prior service on hung jury).  Because it was determined that the Prosecutor's explanation was based on something other than the races of Puckett and Johnson, the appellate court was satisfied with the Prosecutor's stated reasons and affirmed the trial court's denial of Petitioner's Batson motions.  The Court's review of the record confirms that the trial and appellate courts' determination of Petitioner's claim was not contrary to, or an unreasonable application of, federal law.  See 28 U.S.C. § 2254(d).

Accordingly, Petitioner is not entitled to habeas relief as to his claim of the Prosecutor's illegal use of a peremptory challenge against prospective jurors Puckett and Johnson.[9]

---

[9]  The appellate court noted that Petitioner also argued that prospective juror Johnson was "challenged in part because he served on a hung jury, yet the prosecutor did not challenge a white juror who served on a hung jury."  Resp't Ex. B-2 at 9-10.  For reasons stated infra, the Court finds that the appellate court's decision to decline Petitioner's invitation to compare responses by African-American jurors with non-African American jurors was not contrary to or an unreasonable interpretation of Supreme Court law.  See infra Discussion, Part III.A.3.c.

United States District Court
For the Northern District of California

1

               **c.**      **Prospective Juror Cooper-Anderson**

2

      Petitioner also argues that he is entitled to habeas relief because the Prosecutor's

3

peremptory challenge against prospective juror Cooper-Anderson was not devoid of

4

impermissible discriminatory motive.  Pet'r Ex. 1[10] at 14-15.

5

      The trial court applied the three-step process as set out in <u>Batson</u>.  In establishing the

6

first step of <u>Batson</u>, where Petitioner must make a prima facie showing that the prosecutor has

7

exercised peremptory challenges on the basis of race, the trial court found: (1) prospective juror

8

Cooper-Anderson was an African-American and, therefore, from a cognizable group; (2) the

9

Prosecutor used his peremptory strike against Cooper-Anderson; and (3) Petitioner had

10

established that the relevant facts gave rise to an inference of discriminatory purpose that the

11

challenge was motivated by race.  <u>See</u> <u>Cooperwood</u>, 245 F.3d at 1047-48 (quoting <u>Batson</u>, 476

12

U.S. at 96); <u>see</u> <u>J.E.B.</u>, 511 U.S. at 144-45.  The trial court then requested the Prosecutor to

13

come forward with an explanation for the challenge, the second step of the <u>Batson</u> analysis.

14

The Prosecutor explained his reasons for excusing prospective juror Cooper-Anderson as

15

follows:

16

17

      As to Ms. Janice Cooper-Anderson.  This one surprised me.  And Mr. Najera
[defense counsel] surprises me.  We actually discussed her before we even did

18

this.  But the court will recall that she indicated that she shops at Foods Co. one to
three times a month.  The very same Foods Co. where this occurred.  Now I

19

personally like to have people that are not familiar with the crime scene when I do
a case.  It's a personal preference.  I find that there [sic] are more receptive to

20

listening to witnesses and basing their decision based on witnesses' testimony not
what they believe.  [¶]  Second, as I told Mr. Najera -- who I believe may have

21

bumped her if I did not -- I was concerned because there's always a potential

22

---

23

    [10]    In ruling on the merits of his claims, the Court will also consider "Exhibit 1" attached to

24

Petitioner's second amended petition, which includes his petition for review to the California
Supreme Court.  Petitioner has attached pages from his petition of review with his original petition

25

and his second amended petition.  In his third amended petition, Petitioner makes reference to his
"arguments [and] briefs submitted to the state court."  Therefore, the Court will incorporate

26

Petitioner's arguments in his petition for review in his federal petition.  The Court notes that the
petition for review attached to the second amended petition has incorrect page numbers handwritten

27

on it.  Therefore, for clarity purposes, the Court will cite to the arguments in his petition for review
as "Pet'r Ex. 1" and use the correct page numbers reflected on the clean copy of Petitioner's petition

28

for review, which was lodged as an exhibit by Respondent.  <u>See</u> Resp't Ex. C-1.

United States District Court

For the Northern District of California

when I start calling witnesses in here that she may not recognize somebody's name but she will recognize that witness. When you go into [a] retail store, there is an issue. I've gone in before and there's some employees that I can't stand and there are some that I like. Some I've had bad experiences with; others I have not. My concern is that some of those emotions or feelings could come out in this case. So based on her close ties to Foods Co., I did not want to take the chance of any improper decisions unfavorable to the People being used by Ms. Anderson. Again, a perfectly rational, valid reason to kick somebody.

RT 346.

The trial court then conducted the third step of the <u>Batson</u> analysis and evaluated the Prosecutor's proffered reasons for excusing prospective juror Cooper-Anderson before finding that there was no purposeful discrimination. RT 370, 378.

Petitioner argues that the trial court erred in its application of the third requirement of the <u>Batson</u> standard by failing to use comparative analysis in reviewing the Prosecutor's reasons for excusing Cooper-Anderson. Pet'r Ex. 1 at 14-15. The appellate court stated:

[Petitioner] notes that Cooper-Anderson was challenged because she shops at Foodsco [sic] one to three times a month, but Jamal Saleh, a non-African American juror who shops at the same store, was not challenged.

Resp't Ex. B-2 at 9.

In rejecting Petitioner's argument, the appellate court stated:

Our Supreme Court has stated: "[A]n appellate court will not reassess good faith by conducting its own comparative juror analysis. Such an approach would undermine the trial court's credibility determinations and would discount '"the variety of [subjective] factors and considerations,"' including 'prospective jurors' body language or manner of answering questions,' which legitimately inform a trial lawyer's [sic] decision to exercise peremptory challenges. [Citations.]" (*People v. Montiel* (1993) 5 Cal.4th 877, 909.) The responses of prospective Juror Jamal Saleh are an example of the "variety of factors and considerations" informing the prosecutor's decision and why a comparative juror analysis can be unduly narrow. Saleh also shops at Foodsco [sic]. However, the father of Saleh's best friend was a Richmond police officer and Saleh works at his family-owned store where shoplifting is a constant problem. Saleh was excluded by the defense.

<u>Id.</u> at 10.

Comparative analysis is a "well established tool" for detecting the third step of the <u>Batson</u> analysis, i.e., "whether the opponent of the strike has proved purposeful discrimination." <u>Batson</u>, 476 U.S. at 98; <u>Purkett</u>, 514 U.S. at 767. It involves a comparison between the responses, given by the prospective jurors who were struck and those who were not struck, to

19

United States District Court
For the Northern District of California

determine whether the prosecutor's motive was discriminatory in nature. While the Supreme Court is silent on this issue, the Ninth Circuit has utilized comparative analysis in habeas petitions originating from California state courts. See United States v. Chinchilla, 874 F.2d 695, 698-99 (9th Cir. 1989); Burks, 27 F.3d at 1427; McClain, 217 F.3d 1209. The California Supreme Court, however, has explicitly rejected the use of comparative analysis, stating that "an appellate court will not reassess good faith by conducting its own comparative juror analysis." People v. Montiel, 5 Cal. 4th 877, 909 (1993). In a more recent decision endorsing the use of comparative analysis, the Ninth Circuit did not specifically address the California Supreme Court's disavowal of comparative analysis. See McClain, 217 F.3d at 1220-22.

The Court recognizes a conflict between the practice of the California Supreme Court and the Ninth Circuit on the issue of comparative analysis. Compare Chinchilla, 874 F.2d at 698-99, with People v. Johnson, 47 Cal. 3d 1194 (1989); see also Burks, 27 F.3d at 1427. However, the Ninth Circuit has acknowledged that the Supreme Court is silent on the issue of comparative analysis. See Burks, 27 F.3d at 1427 ("The U.S. Supreme Court has not yet ruled on the role of comparative analysis, so no one is quite sure whether our circuit or the California Supreme Court is right."). Additionally, this Court is unable to reverse a state court decision merely because that decision conflicts with Ninth Circuit precedent on a federal constitutional issue. See Duhaime v. Ducharme, 200 F.3d 597, 600 (9th Cir. 2000).

Even if it appears that the law in the Ninth Circuit is to allow the use of comparative analysis, it does not "diminish the deference we must give to findings properly made by a trial court." See Batson, 476 U.S. at 98 (a reviewing court ordinarily should give the trial court's findings great deference in the context of deciding, at the final step of the analysis, whether the defendant has established purposeful discrimination); Kesser v. Cambra, 392 F.3d 327, 343-44 (9th Cir. 2004) (declining to undertake, or direct the district court to undertake, a comparative juror analysis, when a record supporting a comparative juror analysis had not been developed in the state court proceeding).

While Federal courts consider comparative analysis a useful tool for analyzing

20

United States District Court

For the Northern District of California

peremptory strikes under federal law, it is not mandatory.  Therefore, the Court finds that the appellate court's decision -- to decline Petitioner's invitation to compare responses given by Cooper-Anderson with the responses given by a non-African American juror -- is not contrary to, or an unreasonable application of, clearly established federal law.  See 28 U.S.C. § 2254(d).

Accordingly, Petitioner is not entitled to habeas relief as to his Batson claim involving prospective juror Cooper-Anderson.

### d.   **Prospective Juror Lewis**

The appellate court explains the background facts that led to Petitioner's Batson motion involving prospective juror Lewis:

> . . . . voir dire continued and the prosecutor excused another African-American juror, Christopher Lewis.  Defendant renewed his *Wheeler* motion. During questioning by the court and attorneys, Lewis explained that he works as a cosmetologist at a beauty salon as an independent contractor and supervises no other employees.  In chambers, the court described Lewis as a man dressed as a woman.
>
> The court asked the prosecutor to explain his reasons for challenging Lewis.

Resp't Ex. B-2 at 6.

Based on this background outlined by the appellate court, it is evident that the trial court applied the three-step process as set out in Batson.  To establish a prima facie case, the trial court expressly found: (1) prospective juror Lewis was an African-American and, therefore, from a cognizable group; (2) the Prosecutor used his peremptory strike against Lewis and (3) Petitioner had established that the relevant facts gave rise to an inference of discriminatory purpose that the challenge was motivated by race.  See Cooperwood, 245 F.3d at 1047-48 (quoting Batson, 476 U.S. at 96); see J.E.B., 511 U.S. at 144-45.  The trial court then requested the Prosecutor to come forward with an explanation for the challenge, the second step of the Batson analysis.  The prosecutor explained his reasons for dismissing Lewis as follows:

> I believe that people who are either transexuals [sic] or transvestites -- I don't know what the proper term is -- traditionally are more liberal-minded thinking people, tend to associate more with the defendants because, obviously, they have been either ridiculed before or are feeling in a position of being in a microscope

21

all the time and are outcasts which lends themselves to associating more with the defendant.  [¶]   And you know, it's the same reason that a lot of D.A.'s -- me not being one of them -- exclude teachers because . . . teachers tend to be more liberal-minded thinking people.   I do believe that cross-dressers are definitely more liberal-minded thinking people and tend to be more anti-government, which in that case would be myself.  [¶]   In addition, as I've told the court yesterday, I am trying to pick a jury of people who have a stake in the community and are in supervisory positions, are familiar with that type of organization or jobs, and all the jobs on the people of the jury right now do reflect that.   Some sort of something more than just your ordinary job.  I mean, some kind of job where they have to make important decisions day in and day out.  [¶]   Mr. or Ms. Lewis was self-employed.   She originally said cosmetology.  I asked the court to expand on that because I needed more information.   The court did.   He or she indicated that -- I'm going to refer to her as "she" because I believe she was holding herself out to be that today.   She worked in a booth, in a store that was not owned by her.   She rented out a booth.   She had no employees underneath her.   Nobody over her.   Essentially she worked for herself cutting hair and doing nails.  [¶]   I believe it [sic] to be a good, fair juror and to work with the other jurors in a deliberation process it is an important factor that your job duties not only include some sort of decision making but that you're also exposed to either somebody telling you what to do, so you have to take instructions and you're used to working with people or that you have to work with people by directing other people what to do.   There's some open lines of communication that are need[ed] in deliberations.   When you work alone in a booth with nobody responsible to you, I believe that you don't have that same life experience that I'm looking for as a juror.  [¶]   In addition, she's single.   No children.   I believe that's probably explained by the cross-dressing status of Miss Lewis.   But again, there's no relationship, a marriage relationship where there's been give and take.   There's no children that she's been responsible for.   There has to be some give and take which is necessary in jury deliberation.   She knows nobody in law enforcement.   Never been on a jury before.   And I know the court is . . . concerned, but I think that it's an unfortunate set of circumstances that at this point in the proceedings this juror's up there.  [¶]   I represent the People, and I just don't believe that somebody who is either a man or a woman with that kind of liberal attitude with no stake in the community, with no experience supervising people or having people supervise them having to work with other people and identifying probably more towards the defense that it would be fair to the People of the State of California if I did not exercise a peremptory challenge on that individual.   And I believe the reasons are borne out by the record.  [¶]   I would also indicate in my experience -- and I know we didn't ask her directly -- but when people cut hair in that type of situation, their income is based solely on them being there and cutting hair.   There's obviously nobody paying her if she doesn't cut hair.  [¶]   It's a concern when people are self-employed like that.   If this trial drags on as it has so far, that will become an issue, and they will want to get out of here, and they will not deliberate.   And in fact, I believe the court heard her when she was excused.   It was the first time or second time that she smiled in two days, and she said, "Thank you," and seemed very happy to be leaving.

RT 426-429.

    After the prosecutor gave his reasons for dismissing Lewis, the following dialogue

22

occurred:

| | | |
|---|---|---|
| COURT: | | Did you excuse Chris Lewis or Christopher Lewis partly -- and I think that you alluded to this originally.  You had some reason to believe that this individual was a cross-dresser or transvestite? |
| PROSECUTOR: | | Yes. |
| COURT: | | And that was, in part, the reason that you excused this person? |
| PROSECUTOR: | | Yes. |

RT 429-430.

After this exchange, the appellate court states the trial court then:

. . . inquired of defense counsel whether "transvestite, cross-dressers" are a cognizable group for purpose of a *Wheeler* motion.  The court stated, "I can indicate to the defense that if this is not a protected class or a cognizable group, I intend to deny the motion.  I feel that . . . the explanation given by [the prosecutor] to me is a reasonable explanation.  It is not race.  It was not a racial challenge.  It was a challenge based on other factors."  The court then continued the matter until the afternoon session so that defense counsel could apprise the court whether cross dressers or transvestites are a cognizable group.

Following the recess, defense counsel advised that he was unable to answer the court's question.  When defense counsel opined that society lumps together transvestites and homosexuals, the court responded, "I don't believe transvestites are automatically gay people." Defense counsel replied, "I'm not saying that they are.  But I'm saying their being perceived as part of an outside group that are often in a derogatory manner termed in that as if they were homosexual . . . .  We didn't know anything about Miss Lewis's sexual orientation.  That I want to make sure that the record is preserved on that as well." The court then denied the *Wheeler* motion as to Lewis, stating: "My ruling will be that I don't believe that Mr. Lewis falls within a cognizable group, other than his being African-American and -- he clearly is an African-American gentleman.  [¶] I have to now decide whether or not the [P]eople's exclusion or [exercise of] a peremptory challenge was actually based on race.  Right?  Because I have no case law that would indicate if it was based on his being a transvestite, which I think [the prosecutor] has admitted was partly . . . the reason that he did excuse him, and I think your logic was that somebody who's a transvestite may consider themselves kind of the subject of discrimination and may very well be much more lenient in deciding a defendant's fate than someone who exhibited that situation." The court concluded that race was not the basis for Lewis's exclusion and that there were other reasonable factors identified by the prosecutor for challenging the juror.

Resp't Ex. B-2 at 7-8 (footnote omitted).

Petitioner argues that the Prosecutor challenged Lewis because of his sexual orientation,

which is a cognizable group that cannot be discriminated against in jury selection.  Pet'r Ex. 1 at

13-14.  The appellate court found Petitioner's argument meritless and affirmed the trial court's

finding that the Prosecutor's challenge was not based on race, and that cross dressers or

transvestites did not belong to a cognizable group:

> As to Lewis, the [trial] court concluded the challenge was not based on race.  Substantial evidence supports that determination.  Indeed, [Petitioner] argues that Lewis was excused primarily because of his sexual orientation.  [Petitioner] argues that the court mistakenly believed Lewis is not part of a cognizable group.  He points out that at the time of the trial court's ruling, the court of appeal had not yet published *People v. Garcia,* which held that homosexuals constitute a cognizable group that cannot be discriminated against injury selection.  (*Supra*, 77 Cal.App.4th at p. 1275.)  [Petitioner] argues that *Garcia* "makes clear that Lewis belonged to a protected class, and his sexual orientation could not be used as a basis for excluding him as a juror."

> [Petitioner] misreads the record as to the prosecutor's reasons for excluding Lewis.  The prosecutor did not say he was challenging Lewis because of his sexual orientation, but because Lewis was a "cross-dresser or a transvestite."  When defense counsel suggested "a tendency by the majority of our society to lump transvestites, transexuals [*sic*][and] homosexuals" in a group, the court responded, "I don't believe transvestites are automatically gay people."  Defense counsel replied, "I'm not saying that they are" and emphasized for the record, "We didn't know anything about Miss Lewis's sexual orientation."

> As defense counsel below acknowledged the record does not reveal anything about Mr. Lewis's sexual orientation.  It does reveal that on the day he appeared in court for jury duty he dressed as a woman.  Selecting a jury is an art not a science.  Trial lawyers are given great latitude in the selection of jurors so long as they do not excuse a prospective member because of prejudice against a cognizable group.  The way individuals present themselves in terms of dress, jewelry, hairstyle, and conventional or unconventional behavior may be legitimate clues as to their views and their ability to interact with others.  Indeed, the Supreme Court noted in *Wheeler* that "a prosecutor may fear bias on the part of one juror . . . simply because his clothes or hair length suggest an unconventional lifestyle."  (*Wheeler, supra,* 22 Cal.3d at p. 275.)  In *Rubio v. Superior Court* (1979) 24 Cal.3d 93, the Supreme Court explained that two requirements are necessary for qualification as a "cognizable group": "First, its members must share a common perspective arising from their life experience in the group, i.e., a perspective gained precisely because they are members of that group.  It is not enough to find a characteristic possessed by some persons in the community but not by others; the characteristic must also impart to its possessors a common social or psychological outlook on human events." (*Id.* at p. 98.)  Second, "[t]he party seeking to prove a violation of the representative cross-section rule must also show that no other members of the community are capable of adequately representing the perspective of the group assertedly excluded."  (*Ibid.*)  No case has yet recognized cross-dressers as a cognizable group.  There is nothing in this record to suggest that such individuals share "a common social or psychological outlook on human events" "gained precisely because" of their life experience as cross-dressers.

24

1    Resp't Ex. B-2 at 11-12.

2           The Court finds the appellate court's decision to affirm the trial court's denial of

3    Petitioner's <u>Batson</u> motion involving prospective juror Lewis was not unreasonable.

4           First, Petitioner fails to show the Prosecutor had discriminatory motive by dismissing

5    Lewis specifically based on sexual orientation.  Petitioner cites <u>People v. Garcia</u>, 77 Cal. App.

6    4th 1269, 1275 (2000), which holds that homosexuals constitute a cognizable group.  Pet'r Ex. 1

7    at 13.  However, the appellate court found that the record "[did] not reveal anything about

8    [Lewis's] sexual orientation."  Resp't Ex. B-2 at 11.  Petitioner has not set forth a sufficient

9    factual basis for his claim that the Prosecutor dismissed Lewis based on sexual orientation,

10   therefore, his argument lacks merit.

11          Secondly, Petitioner claim does not specifically state that Lewis was impermissibly

12   excused because Lewis was a "cross-dresser" or a "transvestite."[11]  Even if Petitioner did

13   specifically make this argument, there is no federal law holding that either cross-dressers or

14   transvestites constitute a protected class within the meaning of <u>Batson</u>.  Even if cross-dressers

15   and transvestites were a protected class, the Court finds that there were other more obvious

16   race-neutral reasons for the Prosecutor's challenge of Lewis, i.e., Lewis's unconventional way of

17   dressing,[12] lack of supervisory experience, financial hardship due to potential loss of income

---

[11]  The appellate court noted that:

. . . [D]efense counsel, in renewing his <u>Wheeler</u> motion, never claimed the prosecutor
impermissibly excused Lewis because he was a transvestite or cross-dresser.  The
only group bias identified by defense counsel was race.  It was the court, not defense
counsel, who questioned whether cross-dressers or transvestites are a cognizable
group.

Resp't Ex. B-2 at 7 n.3.

[12]  The trial court expressed its own personal observations of Lewis for the record:

. . . Chris Lewis appeared to me to be a male that was dressed as a female.  I noticed a
little bit of a beard, to tell you the truth.  Chris Lewis was sitting fairly close to the
court and I can tell from where I was sitting that there appeared to be a little bit of a

United States District Court

For the Northern District of California

upon serving on the jury, and relief upon being excused possibly showing a reluctance to serve as a juror.  See United States v. Lorenzo, 995 F.2d 1448, 1454 (9th Cir. 1993) (lack of attentiveness and physical appearance constitute race neutral reasons for peremptory challenge); Echavarria-Olarte, 904 F.2d at 1395 (same, based on financial hardship); Burks, 27 F.3d at 1426 (same, based on reluctance to serve).  Petitioner was unable to show that Lewis was challenged for impermissible reasons, therefore, the appellate court's ruling was reasonable.  See Johnson v. Campbell, 92 F.3d 951, 953-54 (9th Cir. 1996) (insufficient prima facie case for exclusion based on sexual orientation when defendant made no attempt to show prosecutor had discriminatory motive, neither sexual orientation nor other discrimination was at issue in case and there was obvious neutral reason for challenge).

Accordingly, the appellate court's decision to affirm the trial court's denial of this Batson motion involving prospective juror Lewis was not contrary to or an unreasonable interpretation of Supreme Court law, and Petitioner is not entitled to habeas relief on this claim.

In sum, the Court finds that each of the Prosecutor's peremptory challenges was based on non-racial reasons.   Petitioner has failed to meet his burden to show that the Prosecutor's peremptory challenges against prospective jurors Anderson, Puckett, Johnson, Cooper-Anderson, and Lewis were for a discriminatory purpose.  Therefore, the state courts' conclusion that no equal protection violation resulted was not unreasonable.

Accordingly, Petitioner has not stated a valid Batson claim involving any of the aforementioned prospective jurors, and his claim for habeas relief is denied.

**B.**      **Trial Court's Refusal to Dismiss Juror No. 37 for Juror Bias**

**1.**      **Background**

Petitioner claims that his constitutional rights to a fair and impartial trial were violated when the trial court refused to dismiss Juror No. 37 on the basis of juror bias.  Pet'r Ex. 1 at 13-

mustache or a beard.  And so I can make that observation.

RT 434.

26

15.

The appellate court outlined the facts of Petitioner's claim of juror bias against Juror No. 37:

> During questioning by the court in voir dire, a prospective female juror stated that defendant was making her uncomfortable.  In chambers she expressed her concern that defendant was staring at her and complained that she felt threatened.  The court described the prospective juror as emotional and excused her.  Concerned that other jurors might have had a similar experience, the court inquired of the entire jury whether anything had occurred in the courtroom that caused them concern.  A female juror and Juror No. 37, a male, indicated they wished to speak to the court in chambers.  The female juror expressed her belief that defendant was a "repeat offender" and stated she was uncomfortable because defendant was staring at females in the courtroom.  She complained of his "complete disregard for the proceedings" and advised the court that she could not be impartial.  The court excused her.

> Juror No. 37 explained that the day before, while sitting in the jury pool, defendant stared at him at least twice in a manner that made him uncomfortable.  Juror No. 37 felt "hostile" towards defendant at that time.  Juror No. 37 explained that he did not feel unsafe in the courtroom with defendant, but felt that "on the streets, if I encountered [defendant] and was looked at in that manner, my feeling would be that it was threatening."  The juror told the court that he had since set aside his feelings and was dealing with the problem by not making eye contact with defendant.  The court then asked the juror if he was willing to "assume it was an innocent thing" as it appeared defendant has "a problem with his eye."  Juror No. 37 answered yes.  Juror No. 37 reiterated that he was presently more comfortable with defendant than he had been the day before.  The court asked, "Would you assure us you'll put what happened yesterday aside, give him the benefit of the doubt that he meant no animosity, no ill will towards you.  He just stared, for whatever reason, and you won't let that influence you.  Can you do that?"  Juror No. 37 replied that he could, and advised the court that he could be fair and impartial.

> Defense counsel, who had exercised all his peremptory challenges, asked that Juror No. 37 be excused for cause.  The court denied defendant's motion to excuse the juror, stating: "[Juror No. 37] did indicate privately in chambers that yesterday he was a little concerned about your client staring at him.  And, of course, that's percipitated [sic] by your client.  But he assured everyone on the record and I believed him.  And he said that that is not going to be a problem, and he has no difficulty with it at all right now.  [¶]  And I had expressed to both of you that in listening to him I almost got the feeling that he would be more . . . favorable to the defense than the prosecution.  I mean, I don't know why I got that sense, but it was just obvious that he felt a little guilty about feeling that way and that he was just bending over backwards that he was not going to have any of that bias.  So that's what I thought.  [¶]  But at any rate, I . . . think he was candid, he was honest, and he said absolutely not, it's not going to affect him."

Resp't Ex. B-2 at 12-14.

**2.    <u>Applicable Federal Law</u>**

27

United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The Sixth Amendment guarantees to the criminally accused a fair trial by a panel of impartial jurors.  U.S. Const. amend. VI; see Irvin v. Dowd, 366 U.S. 717, 722 (1961).  "Even if only one juror is unduly biased or prejudiced, the defendant is denied his constitutional right to an impartial jury."  Tinsley v. Borg, 895 F.2d 520, 523-24 (9th Cir. 1990) (internal quotations omitted); see also United States v. Hendrix, 549 F.2d 1225, 1227 (9th Cir.1977) (The bias or prejudice of even a single juror violates a defendant's right to a fair trial.).

The presence of a biased juror cannot be harmless; the error requires a new trial without a showing of actual prejudice.  Dyer v. Calderon, 151 F.3d 970, 973 (9th Cir. 1998).  However, the Constitution "does not require a new trial every time a juror has been placed in a potentially compromising situation." Smith v. Phillips, 455 U.S. 209, 217 (1982).  The safeguards of juror impartiality, such as voir dire and protective instructions from the trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote.  Id.  Due process only means a jury capable and willing to decide the case solely on the evidence before it and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen.  Id.  Such determinations may properly be made at a hearing.  Id.

Clearly established federal law, as determined by the Supreme Court, does not require state or federal courts to hold a hearing every time a claim of juror bias is raised by the parties. Tracey v. Palmateer, 341 F.3d 1037, 1045 (9th Cir. 2003); see also Sims v. Rowland, 414 F.3d 1148, 1153 (9th Cir. 2005) (trial court need not order a hearing sua sponte whenever presented with evidence juror bias).  Remmer v. United States, 347 U.S. 227 (1954), and Smith v. Phillips, supra, do not stand for the proposition that any time evidence of juror bias comes to light, due process requires the trial court to question the jurors alleged to have bias.  Smith states that this "may" be the proper course, and that a hearing "is sufficient" to satisfy due process.  Tracey, 341 F.3d at 1044 (citing Smith, 455 U.S. at 217, 218).  Smith leaves open the door as to whether a hearing is always required and what else may be "sufficient" to alleviate any due process concerns.  455 U.S. at 217, 218; see, e.g., Tracey, 241 F.3d at 1044-45

28

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(concluding that state trial court's decision not to question juror further to obtain names of other jurors and to take additional testimony from them was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent).

Juror bias is a finding of fact determined by the state court, to which a federal reviewing court must defer under section 2254(e)(1).  Wainwright, 469 U.S. at 428; see also Patton v. Yount, 467 U.S. 1025, 1038 (1984) (Juror bias is a question of historical fact.).  A court confronted with a colorable claim of juror bias will generally conduct an investigation.  Davis v. Woodford, 384 F.3d 628, 652-53 (9th Cir. 2004); see also Dyer, 151 F.3d at 974 (cursory in-camera questioning of juror's honesty in voir dire failed to unearth clear evidence of bias).  "So long as the fact-finding process is objective and reasonably explores the issues presented, the state trial judge's findings based on that investigation are entitled to a presumption of correctness."  Dyer, 151 F.3d at 975.

A challenge for cause -- that is, a showing that a juror is not "capable and willing to decide the case solely on the evidence before it," Smith, 455 U.S. at 217 -- may be based either in actual bias or implied bias.  Fields v. Woodford, 309 F.3d 1095, 1103 (9th Cir. 2002).  A prospective juror must be removed for "actual bias" if it is shown that his views would substantially impair the performance of his duties as juror.  Id.  In "exceptional" or "extraordinary" situations bias will be implied.  See McDonough Power Equip. v. Greenwood, 464 U.S. 548, 556-557 (1984) (Blackmun, Stevens and O'Connor, JJ., concurring); id. at 557-58 (Brennan and Marshall, JJ., concurring in the judgment); Fields, 309 F.3d at 1104.  Bias is implied "where the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances."  United States v. Gonzales, 214 F.3d 1109, 1112 (9th Cir. 2000) (internal quotations omitted).

Courts have only presumed the existence of implied bias in rare situations -- for example, where a pattern of lies gives rise to an inference of bias, where certain relationships naturally involve substantial emotional involvement that is destructive of impartiality, or where

29

a juror or jurors were apprised of prejudicial information about the defendant.  See, e.g., Green v. White, 232 F.3d 671, 677-78 (9th Cir. 2000) (implying bias where juror "lied twice to get a seat on the jury [and] when asked about these lies, . . . provided misleading, contradictory, and outright false answers."); Gonzales, 214 F.3d at 1113-14 (implying bias in trial for cocaine distribution where the juror had recently gone through a painful divorce that was in part a result of her husband's use and dealing of cocaine); cf. Leonard v. United States, 378 U.S. 544, 545 (1964) (per curiam) (in successive trials, jury should not have been selected from panel that had heard the announcement of a prior guilty verdict for the defendant on a similar charge).

### 3.    Analysis

After a careful review of the record and relevant cases, the Court is satisfied that the appellate court's decision to affirm the trial court's denial of a new trial based on Juror No. 37's actual bias toward Petitioner was not "objectively unreasonable."  Andrade, 538 U.S. at 63.

A federal court may grant the writ if it concludes that the state court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the [s]tate court proceeding."  28 U.S.C. § 2254(d)(2).  A district court must presume correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. 29 U.S.C. § 2254(e)(1).

Section 2254(d)(2) applies to intrinsic review of a state court's fact-finding process, or situations in which the petitioner challenges the state court's fact-findings based entirely on the state court record, whereas section 2254(e)(1) applies to challenges based on extrinsic evidence, or evidence presented for the first time in federal court.  See Taylor v. Maddox, 366 F.3d 992, 999-1000 (9th Cir. 2004).  In Taylor, the Ninth Circuit established a two-part analysis under sections 2254(d)(2) and (e)(1).  Id.  First, federal courts must undertake an "intrinsic review" of the state court's fact-finding process under the "unreasonable determination" clause of section 2254(d)(2).  Id. at 1000.  The intrinsic review requires federal courts to examine the state court's fact-finding process, not its findings.  Id.  Once the state court's fact-finding process survives

30

**United States District Court**
For the Northern District of California

1    this intrinsic review, the second part of the analysis begins by dressing the state court finding in

2    a presumption of correctness under section 2254(e)(1).  Id.  According to the AEDPA, this

3    presumption means that the state court's fact-finding may be overturned based on new evidence

4    presented by the Petitioner for the first time in federal court only if such new evidence amounts

5    to clear and convincing proof that the state court finding is in error.  See 28 U.S.C. §

6    2254(e)(1).  "Significantly, the presumption of correctness and the clear-and-convincing

7    standard of proof only come into play once the state court's fact-findings survive any intrinsic

8    challenge; they do not apply to a challenge that is governed by the deference implicit in the

9    "unreasonable determination" standard of section 2254(d)(2)."  Taylor, 366 F.2d at 1000.

10         The relevant question under section 2254(d)(2) is if an appellate panel applying the

11   normal standards of appellate review, could reasonably conclude whether or not a state court

12   finding is supported by the record.  Lambert v. Blodgett, 303 F.3d 943, 978 (9th Cir. 2004).

13   Petitioner argues that the appellate court erred in upholding the trial court's refusal to dismiss

14   Juror No. 37 for cause.  Pet'r Ex. 1 at 17.  Respondent disagrees and argues that the appellate

15   court correctly upheld the trial court's ruling because "'the trial court carefully observed Juror

16   No. 37's demeanor and weighed his answers in ruling that the juror could be fair and impartial."

17   Answer at 17 (citing Resp't Ex. B-2 at 14).  Because Petitioner is challenging the appellate

18   court's fact-findings based on the state court record, the Court will conduct its analysis under

19   Section 2254(d)(2) and undertake an "intrinsic" review of the appellate court's fact-finding

20   process.

21

22         The Court finds that the fact-finding process used by the appellate court was reasonable.

23   In Petitioner's case, the appellate court reviewed the record and the trial court's comments to

24   determine that "substantial evidence supports the [trial] court's determination" that Juror No. 37

25   could be fair and impartial.  Resp't Ex. B-2 at 14.  In a reasoned decision, the appellate court

26   determined that Petitioner failed to satisfy his burden of demonstrating actual prejudice from the

27   alleged juror bias and affirmed the trial court's order denying Petitioner's request to dismiss

28   Juror No. 37 for cause.  The Court concludes that Petitioner had a full, fair and complete

opportunity to present evidence in support of his claim to the state courts, of which he took full advantage.  See id.  Therefore, the Court finds that the appellate court's fact-finding process was intrinsically reasonable.

Upon finding that the appellate court's fact-finding process survives an intrinsic review, the Court must turn to the appellate court finding which is "dressed in a presumption of correctness" and determine if Petitioner has rebutted this presumption by clear and convincing evidence.  See Taylor, 366 F.2d at 1000.

In the instant case, the appellate court finding that Petitioner was not actually prejudiced due to the juror bias is presumed correct under section 2254(e)(1).  Petitioner attempts to rebut the appellate court finding by stating:

> [the appellate court] misses the point.  Juror # 37 was already biased against [Petitioner] at the time of voir dire, having already concluded that [Petitioner] had stared at him in a threatening manner.  Juror #37's "solution" to his feeling of being threatened, acting unnaturally and avoiding looking at [Petitioner], was merely evidence of his bias.
>
> Moreover, Juror # 37, before hearing any evidence, believed [Petitioner] capable of frightening people, as the thief did in Foodsco [sic].  And, Juror # 37, before hearing any evidence, believed [Petitioner's] stare, and his eyes were so peculiar as to be frightening.  These beliefs were not based on any evidence, but instead based on an improper bias against [Petitioner].

Pet'r Ex. 1 at 17.

The Court finds that Petitioner has not rebutted the presumption of correctness of the appellate court's determination that Petitioner was not prejudiced by juror bias.  There was sufficient evidence that Juror No. 37 could be fair and impartial because he no longer felt "uncomfortable" by Petitioner's staring at him:

> JUROR NO. 37:        All I can say is I'm much more comfortable today with the situation.  I glanced in Mr. Carter's way but not fixed my stare at him.  All I can say is I feel much more comfortable today about the situation.
>
> COURT:                   Would you assure us you'll put what happened yesterday aside, give him the benefit of the doubt that he meant no animosity, no ill will towards you. He just stared for whatever reason, and you won't let that influence you.  Can you do that?

United States District Court
For the Northern District of California

| | | |
|---|---|---|
| JUROR NO. 37: | Yes, I will do that. | |
| COURT: | Can you assure both counsel and I of that? | |
| JUROR NO. 37: | Yes. | |

. . . .

| | |
|---|---|
| COURT: | Right here as you sit here now, do you feel you could be fair and impartial to Mr. Carter? |
| JUROR NO. 37: | Yes. |
| COURT: | You understand he's presumed to be innocent of all charges, and you will afford him that presumption? |
| JUROR NO. 37: | I will give him that presumption. |
| COURT: | Nothing has happened yesterday, today, anything has happened to prevent you from doing that? |
| JUROR NO. 37: | No.  In fact, I feel even that as this goes on that I'm feeling more like giving him that benefit of the doubt, where yesterday probably not. |

RT 540-41.

Defense Counsel's challenge for cause was denied by the trial court, as was the motion for mistrial.  The appellate court found:

> The trial court carefully observed Juror No. 37's demeanor and weighed his answers in ruling that the juror could be fair and impartial.  Substantial evidence supports the court's determination.

Resp't Ex. B-2 at 14.  The Court concludes that the appellate court's decision to uphold the trial court's ruling that there was no showing of juror bias that would justify a challenge for cause, was not "objectively unreasonable."  Furthermore, in light of the lack of evidence of bias, the trial court reasonably concluded that the Juror No. 37 could be fair and impartial.  The instant case is not the kind of extreme case where courts have implied bias.  See, e.g., Green, 232 F.3d at 677-78; Gonzales, 214 F.3d at 1113-14.  Therefore, the state courts' rejection of Petitioner's claim was not based on an unreasonable determination of the facts, nor was it contrary to, or an unreasonable application of, clearly established federal law.  See 28 U.S.C. § 2254(d).

Accordingly, Petitioner is not entitled to habeas relief on his juror bias claim involving

33

1    Juror No. 37.

2    //

3    //

4        **C.    Suggestive Photographic Lineup**

5            **1.    Background**

6        The following factual background from the trial record, which outlines the series of

7    events directly after the crime and leading up to the pre-trial identification by the witnesses at

8    Foods Co., was taken from Respondent's Answer:

9            Officer Walter Trujillo was one of the first officers on the scene.  RT
10        1010.  He obtained descriptions of the suspect from Bailey, Alwareeth,
         Halcrombe, and Turner.  RT 1011.  Bailey told Trujillo that the suspect was a
11        Black male, in his forties, and approximately 5' 11.  He was wearing blue jeans, a
         white baseball cap, and possibly had a left glass eye, or disfigured eye.  RT 1012.

12            Alwareeth gave a virtually identical description.  He too indicated that the
13        suspect had a glass or disabled left eye.  RT 1013.  According to Halcrombe, the
         suspect was a Black male in his forties, had a thin build, and was approximately
14        150 pounds.  Halcrombe indicated that the suspect's left eye was "all fucked up."
         RT 1014.  Patricia Turner initially told Trujillo that she thought she knew the
15        suspect, and had seen him in North Richmond.  RT 1014.  She also stated that the
         suspect had a dark complexion, a disfigured left eye, and was wearing blue jeans.
16        RT 1014-1015.

17            The police later took Alwareeth to identify a possible suspect.  Alwareeth
18        indicated that the man was not the person who had held a gun on him.  The
         suspect who had been detained was chubby, whereas [the "guy who held the
19        gun"] was very "skinny." RT 745.  Alwareeth was "positive" [Petitioner] was the
         person who had held the gun on him.  RT 745.

20            Although Foodsco [sic] had a surveillance camera, Alwareeth was unable
21        to find a tape in the camera.  RT 745-746.  Alwareeth then got a surveillance tape
         from the bank which was located inside the store to see if it showed [Petitioner].
22        RT 746.  Alwareeth looked at the tape with Detective Hendrickson [sic] and
         identified [Petitioner] on the tape.  RT 747.

23
             Officer Newton, of the Richmond police department, was familiar with
24        [Petitioner] as a result of approximately seven or eight contacts over the
         preceding two or three years.  RT 929-930, 935.  On May 5, 1999, approximately
25        one week after the Foodsco [sic] incident, Newton recalled seeing [Petitioner]
         standing on the corner of 7th and Pennsylvania, about one block from his
26        residence at 731 Lucas Avenue.  [Petitioner's] residence was approximately five
         blocks south and four blocks east of the Foodsco [sic] store.  RT 932.  Newton
27        explained that [Petitioner's] apartment was detached from the main building and
         was located over the top of a garage.  RT 934.  Newton remembered contacting
28        [Petitioner] at 731 Lucas Avenue approximately four to six months prior to the

34

time when [Petitioner] was taken into custody.  RT 937.

Officer DeVille, of the Richmond police department, testified that on February 16, 1998, he saw [Petitioner] in the driveway of 731 Lucas Avenue.  RT 939.  [Petitioner] identified himself as Jimmy Lee Carter to officer DeVille and gave his address as 731 Lucas Avenue.  RT 940.

**Photographic Lineup**

Detective Hendricsen compiled a photo lineup with [Petitioner's] picture, using what is called "the Photo Imaging System for Contra Costa County ."  RT 952.  Under that system, police enter the photo of a suspect and program the machine to find five similar looking people who match the suspect's physical characteristics.  The machine then places the suspect's photo randomly among the five other photos.  RT 953.  Hendricsen stated that he did not try to include people in the lineup who had eye deformities because [Petitioner's] picture "did not obviously show a bad eye," and he did not wish to "prejudice the lineup for potential viewers."  RT 995.

When Hendricsen showed the photo lineup to Alwareeth, he told him that the suspect's photo may, or may not be, be included in the lineup.  Alwareeth indicated that he understood the admonition, pointed to [Petitioner's] picture, and said, "This is him." RT 955.

Hendricsen next showed the same lineup to Patricia Turner.  He gave her the same admonition that he had given to Alwareeth.  Turner "almost immediately put her finger on the picture of Mr. Carter" and said, "That's him, but he's thinner now." RT 957-959.

Answer at 3-5 (citing to RT).

During trial, Petitioner moved to suppress the identifications of him resulting from a photographic lineup shown to Mr. Alwareeth and Ms. Turner.  RT 124-126.  The trial court denied the motion, stating:

. . . I'm going to make a finding that my observations of Defendant's Exhibit B, the photograph of Mr. Carter and the lineup, is not so impermissibly suggestive as to give rise to a substantial likelihood that misidentification would have resulted from that alone . . . .

. . . .

I mean, just looking at the photograph itself, they are all African-American men.  I mean, their ages all seem to be within the same general age group.  They all have facial hair.  They all have relatively short hair.  None are smiling.  They all just generally appear to be dressed in street clothing.  And that one factor of the left eye I just do not see that it stands out in the manner that you have suggested to the court.

So at this point, facially, I see nothing wrong with the photographic lineup.

35

RT 126.

Petitioner asserts that the photographic lineup shown to the two employees at Foods Co. were unduly suggestive and violated due process because he was the only person in the lineup with a glass eye. Pet'r Ex. 1 at 17. The appellate court conducted its own review of the record and rejected Petitioner's contention:

> Even under independent review, the record is clear that the photographic lineup was not unduly prejudicial.
>
> Defendant argues that his bad eye "drew all the attention to himself in the photographic lineup." Even assuming arguendo that the photo lineup was suggestive, it was nevertheless reliable under the totality of circumstances. Both Turner and Alwareeth were well acquainted with defendant. Both knew he had a facial scar and glass eye. Turner had seen defendant in the store on several other occasions and earlier on the day of the incident. Alwareeth had also seen defendant in the store other times. With no difficulty, Alwareeth earlier identified defendant in the bank's surveillance videotape.

Resp't Ex. B-2 at 15.

### 2.    Applicable Federal Law

"A conviction which rests on a mistaken identification is a gross miscarriage of justice." Stovall v. Denno, 388 U.S. 293, 297 (1967). Procedures by which the defendant is identified as the perpetrator therefore must be examined to assess whether they are unduly suggestive. Neil v. Biggers, 409 U.S. 188, 198 (1972). Due process protects against the admission of evidence deriving from suggestive pretrial identification procedures. Id. at 196. Identification testimony violates due process only if (1) a pretrial encounter is so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification, and (2) the identification is not sufficiently reliable to outweigh the corrupting effects of the suggestive procedure. Van Pilon v. Reed, 799 F.2d 1332, 1338 (9th Cir. 1986). An identification procedure is impermissibly suggestive when it emphasizes the focus upon a single individual, thereby increasing the likelihood of misidentification. Simmons v. U.S., 390 U.S. 377, 382-83 (1968).

However, unnecessarily suggestive pretrial identification procedures alone do not taint in-court identification testimony; reliability is the linchpin in determining the admissibility of

United States District Court

For the Northern District of California

identification testimony.  <u>Manson v. Brathwaite</u>, 432 U.S. 98, 114 (1977).  To determine whether in-court identification testimony is sufficiently reliable, courts consider five factors: (1) the witness' opportunity to view the defendant at the time of the incident; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description; (4) the level of certainty demonstrated by the witness at the time of the identification procedure; and (5) the length of time between the incident and the identification.  <u>Manson</u>, 432 U.S. at 114; <u>Neil</u>, 409 U.S. at 199-200.  These factors should be weighed against the corrupting effect of the suggestive identification itself.  <u>Id.</u>

### 3.   Analysis

The Court will briefly discuss the suggestiveness of the identification procedures and then the reliability of the identification testimony by Mr. Alwareeth and Ms. Turner.

#### a.   Suggestiveness

Petitioner asserts that the trial court erred in denying the motion to suppress the photographic lineup because the lineup suggested the identity of the Petitioner as the person suspected by the police.  Pet'r Ex. 1 at 17-18.  Petitioner points out that the witnesses at Foods Co. were looking for a suspect with a glass eye.  <u>Id.</u> at 18.  Mr. Alwareeth described the man as having "something about his eye [that] was not right" . . . "[i]t look[ed] like a glass eye, white marble eye or something."  RT 731.  Ms. Turner also described the suspect as having a "glass eye [or] marble eye."  RT 793.  Petitioner argues that once Mr. Alwareeth and Ms. Turner were asked to view a lineup card to see if they could identify the suspect, the fact that Petitioner was the only individual with a glass eye suggested to them that he should be identified as the suspect.  <u>Id.</u>

In its analysis of Petitioner's claim, the appellate court chose to assume that the photo lineup was suggestive:

> It is unsettled whether suggestiveness is a question of fact, subject to deferential review on appeal, or a question of law, subject to review <u>de novo</u>.

Resp't Ex. B-2 at 15 (citing <u>People v. Ochoa</u>, 19 Cal. 4th 353, 413 (1998)).

37

Similar to the appellate court, this Court may simply assume that the photographic lineup procedures were indeed suggestive, and focus on the reliability issue. See Van Pilon, 799 F.2d at 1339 (courts may assume suggestiveness). As discussed below, even assuming the photographic lineup procedures were suggestive, both Mr. Alwareeth's and Ms. Turner's identifications of Petitioner were reliable and therefore admissible.

### b.      Reliability

As Manson indicated, reliability is the critical factor in determining the admissibility of identification testimony. 432 U.S. at 114. Thus, even if the procedures were unduly suggestive, so long as the identification was still reliable, then no due process violation occurred. Id. at 106.

Petitioner argues that he has maintained from the start that the witnesses were confusing him with another individual. Pet'r Ex. 1 at 18. He adds that "[a]lthough the witnesses expressed certainty about their identification at trial, the more than 8 month delay in bringing the case to trial strengthened the possibility that they were basing their in-court identification on the lineup card, which they saw in May[] 1999, rather than on the incident." Id.

The Court disagrees with Petitioner's argument and finds that an analysis of the five factors established in Manson reveals that Mr. Alwareeth's and Ms. Turner's identifications were indeed reliable. See Manson, 432 U.S. at 114 (listing the five factors).

First, Mr. Alwareeth and Ms. Turner both had excellent opportunities to view the petitioner. They had a significant period of time to study his appearance because both were present at the store during the commission of the crime. Furthermore, the trial court noted that both witnesses were already acquainted with Petitioner as a result of prior encounters with him at the store. RT 730-731, 791.[13] Mr. Alwareeth stated that Petitioner's presence attracted his

---

[13] During Mr. Alwareeth's direct testimony he stated that he had previously seen Petitioner in the store:

Q.      Had you seen [Petitioner] in your store previously?
A.      Yes, I did.

38

attention because he "comes all the time and steals from the store."[14]  RT 730.  He even asked one of the clerks and security to watch Petitioner while he was at the store on the date of the incident.  RT 732.  Ms. Turner testified that Petitioner had previously come to the store to buy just a candy bar or a Top Ramen.  RT 792.[15]

Both witnesses also had a high degree of attention when viewing Petitioner on the day of the incident.  Ms. Turner's attention was heightened by Petitioner's behavior on the day of the

---

Q.    Approximately how many times?
A.    About twice.

RT 730-731.

During Ms. Turner's direct testimony, she stated that she had also seen Petitioner in the store before the day of the incident:

Q.    Had you seen [Petitioner] in the store before that day?
A.    Yes, yes.
Q.    How many times?
A.    Several times.

RT 791.

[14]  Petitioner argues that no one testified at trial that he was ever arrested at Foods Co. for stealing or ever convicted of shoplifting.  Suppl. Traverse at 6.  However, even if Mr. Alwareeth mistook Petitioner for a shoplifter, the Court still finds reliable Mr. Alwareeth's testimony that he "recognized" Petitioner from prior encounters at Foods Co.  See RT 730-31.

[15]  During Ms. Turner's direct testimony, she stated that she was already familiar with Petitioner prior to the day of the incident:

Q.    That morning, what attracted your attention to [Petitioner]?
A.    He had come in and bought one Top Ramen and been in the store like 15 minutes.  He had been there several times before.  And I had told my manager this one customer keeps coming and buying one Top Ramen or one candy.  That's why I already knew who that person was.

RT 792.

39

United States District Court
For the Northern District of California

incident, especially since she had seen the Petitioner earlier that day.[16]  Further, <u>Manson</u> noted

that an individual who is not a casual or passing observer usually has a high degree of attention.

432 U.S. at 115.  The Court is in agreement with the appellate court's impression that Ms.

Turner had more than a passing interest in Petitioner: Petitioner was a customer who she had

"seen . . . in the store on several other occasions and earlier on the day of the incident."  Resp't

Ex. B-2 at 15.  Meanwhile, Mr. Alwareeth was able to get a clear look at Petitioner while he

was alone in the break room with him.  RT 735.  Mr. Alwareeth testified that when Petitioner

pulled a gun from behind his back, he was only three feet away. RT 736.  Then, he testified that

Petitioner "put [the gun] right to my face, about five inches from my face and he said, 'Get out

of my way or I'll give you this.'"  RT 737.  Therefore, Mr. Alwareeth was able to have a

significant period of time to study Petitioner's appearance during the actual commission of the

crime.

 The third factor to consider is the accuracy of Mr. Alwareeth's and Ms. Turner's earlier

identification.  Both witnesses described Petitioner as having a glass eye or a "disfigured eye."

RT 1013, 1015.  While Petitioner does not dispute that he has a glass eye, he questions the

accuracy of the descriptions given by Mr. Alwareeth and Ms. Turner on the day of the incident:

> . . . Bailey said the suspect was wearing [a] baseball cap, sun glasses and jeans[.]
> (RT 851)  [Mr.] Alwareeth . . . said the suspect was wearing black pants and [a]
> jacket[.]  (RT 731)  Then if [T]urner say [sic] the suspect she saw was wearing a
> beanie (RT 793, 831) that's three different men's [sic] description[s] . . .
> Alwareeth was talking about a different man in black pants and [a] jacket, and
> Turner was talking about a guy in a beanie which is proof that they were not
> talking about the same person and therefore could not have known the suspect.

Suppl. Traverse at 2-3.  The Court notes, however, that Petitioner has neglected to mention that

---

[16]  After identifying Petitioner as the person she had seen in the store "several times prior to
April 28th and also . . . on April 28th around 3:00," Ms. Turner testified on direct as follows:

Q. When you saw [Petitioner] coming back in the store around 3:00 . . . on April 28th,
what did you do at that time?
A. I called my manager.  I called my manager, Ibrahim.  The same gentleman is in the
store.  He then told security.

RT 794.

United States District Court

For the Northern District of California

1     both Mr. Alwareeth and Ms. Turner described the suspect who perpetrated the crime as having a

2     glass eye,[17] RT 1013, 1015, which is a very distinct and unique type of description. The Court

3     is satisfied that both witnesses gave accurate descriptions of the suspect, which aided in their

4     eventual identifications of Petitioner.

5             Mr. Alwareeth's and Ms. Turner's level of certainty is also a factor to weigh in

6     determining the reliability of their identification. When each witness was shown the

7     photographic lineup, both Mr. Alwareeth and Ms. Turner immediately identified Petitioner's

8     photograph without hesitation.[18] RT 956, 959.

9             The time between the crime and the witnesses' identification is the final factor to

10    consider for reliability purposes. The incident occurred on April 28, 1999. RT 730. The

11    photographic lineup was shown to Mr. Alwareeth and Ms. Turner on May 10, 1999 and May

12    11, 1999, respectively. RT 954, 957. Thus, the photographic lineup was shown to the

13    witnesses less than two weeks after the crime. Several cases on point have approved shorter

14    periods of time. See e.g, Manson, 432 U.S. at 116 (two days passed between crime and

15    identification); Ponce, 735 F. 2d at 337 (five hours); Simoy, 998 F. 2d at 752 (six days).

16    However, the Supreme Court in Neil v. Biggers did allow a seven-month lag between the crime

17    and the identification. 409 U.S. at 201. Additionally, courts have weighed the fact that the

18    initial description was given within minutes of the crime. See Manson, 432 U.S. at 115-16.

19    Here, Mr. Alwareeth and Ms. Turner gave descriptions of the suspect to Officer Trujillo,

20

21    ————————————————

22        [17] Petitioner argues that while Ms. Turner testified that the suspect had a glass eye, "she
admitted on cross-examination at trial that she told the police officer after the incident that she could

23    not see the man's eyes because he wore sunglasses . . . ." Suppl. Traverse at 2 (citing RT 838). Ms.
Turner also testifies on re-direct that even if she did previously state that the suspect was wearing

24    sunglasses she didn't specify "whether that was when he came in the store or was leaving the store
[after the incident]." RT 847. Furthermore, when asked if she was sure the person she saw in the

25    store on April 28th was the man she pointed out in court, Ms. Turner answered, "Definitely,

26    definitely." RT 848. Therefore, based on the record, the Court is satisfied that Ms. Turner's
description of the suspect and identification of Petitioner were accurate.

27

28        [18] The Court notes that the appellate court pointed out that Mr. Alwareeth also earlier
identified Petitioner in the bank's surveillance videotape. Resp't Ex. B-2 at 15.

approximately twenty minutes after the crime occurred.  RT 1017.

Based on these factors, the state courts did not misapply federal law as established in Manson.  Mr. Alwareeth and Ms. Turner each (1) had ample opportunity to view Petitioner, (2) had a high degree of attention when viewing him, (2) had given a prior accurate description of the suspect, (4) had a high level of certainty when identifying Petitioner as the perpetrator of the crime, and (5) identified Petitioner in the photographic lineup within two weeks of the crime. The Court notes that while the time between the crime and the witnesses' identification was almost two weeks, it was not substantially longer than other lag periods approved by the Supreme Court, especially considering both witnesses gave an initial description shortly after the event.  Therefore, it was not an unreasonable application of Supreme Court law for the state courts to weigh the same factors as those outlined in  Manson against the possible suggestiveness of the procedures and conclude that the identification was reliable and therefore admissible.

Accordingly, Petitioner's claim for habeas relief based on a suggestive photographic lineup is denied.

### D.   **Insufficiency of Evidence of Firearm and Ammunition Possession**

#### 1.   **Background**

Petitioner argues that there was insufficient evidence to establish the gun-use enhancement and Petitioner's conviction as an ex-felon in possession of a firearm.  Pet'r Ex. 1 at 19.  Petitioner also argues that there was insufficient evidence introduced at trial tying him to the ammunition found in the police search of the apartment on 731 Lucas Street.  Id. at 21.

#### 2.   **Applicable Federal Law**

As a matter of federal constitutional law, "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005) (quoting In re Winship, 397 U.S. 358, 364 (1970)); see also Herrera v. Collins, 506 U.S. 390, 402 (1993) (noting that a conviction based on evidence that fails to meet the Winship

standard is an independent constitutional violation).  A petitioner for a federal writ of habeas corpus faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds.  Juan H., 408 F.3d at 1274.  In Jackson v. Virginia, the Supreme Court held that "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  443 U.S. 307, 319 (1979) (emphasis in original).  After the AEDPA, the Jackson standard is applied with an additional layer of deference to the state courts.  Id. (citing 28 U.S.C. § 2254(d)).

### 3.    Analysis

In this case, the appellate court identified the relevant standards of review as those set out in Jackson and applied California cases with standards entirely consistent with controlling federal law:

> . . . the reviewing court must examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence -- evidence that is reasonable, credible and of solid value -- such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.

Resp't Ex. B-2 at 15-16 (citing People v. Kraft, 23 Cal. 4th 978, 1053 (2000) (citing People v. Johnson, 26 Cal. 3d 557, 578 (1980) (citing Jackson, 443 U.S. at 318-19))).  Therefore, the standards applied by the appellate court were not contrary to Supreme Court precedent.  See Williams v. Taylor, 529 U.S. 362, 412-13 (2000).  Accordingly, the Court asks whether the decision of the California Court of Appeal "reflected an 'unreasonable application of' Jackson and Winship to the facts of this case."  Juan H., 408 F.3d at 1275 (citations omitted).  An unreasonable application means that the appellate court's application was "objectively unreasonable."  Id. at 1275 n.13 (citing Williams, 529 U.S. at 409).

Although a sufficiency of the evidence review is grounded in the Fourteenth Amendment, the inquiry is undertaken with reference to the elements of the criminal offense as set forth by state law.  Id. at 1275-76 (citing Jackson, 443 U.S. at 324 n.16).  The Court will discuss Petitioner's claims involving his charges of firearm possession (Claim Four) and

43

ammunition possession (Claim Five) individually.

### a. **Firearm Possession**

In the state court proceedings, Petitioner was found guilty of being an ex-felon in possession of a firearm (Cal. Penal Code § 12021(a)(1)) and, therefore, subject to the gun-use enhancement for using a gun during the commission of a felony (Cal. Penal Code § 12022(b)(1)).  Resp't Ex. A-I; CT 357.

Under California law, ex-felons are prohibited from possessing firearms.  People v. Ratcliff, 223 Cal. App. 3d 1401, 1409 (1990) ("an ex-felon who owns, possesses, or has custody or control of a firearm commits a felony").  Furthermore, criminals who use a gun during the commission of a felony are subject to a one-year sentence enhancement.  Cal. Penal Code § 12022(b)(1).

Petitioner argues that "[t]he evidence at trial did not establish that the object displayed by the [suspect] was a real gun."  Pet'r Ex. 1 at 19.  Therefore, he claims that the evidence is insufficient to establish the gun-use enhancement and that Petitioner was in possession of a firearm as an ex-felon.  Id.

Respondent argues that the gun-use enhancement was put into effect without the need to demonstrate the gun's operability:

The purpose of the gun-use enhancement is

> to deter both physical harm and conduct which produces fear of harm. The fear may arise either from a gun that really shoots or from one which is designed to shoot and gives the appearance of shooting capability.  Persons held at gunpoint have no stomach for inquiry. Danger radiates not only from the weapon, but from the defensive reactions of others.  In response to the lawbreaker's weapon, operable or not, a victim or law officer may himself resort to a firearm.  Further, a demand for affirmative proof of operability would allow the defendant to frustrate the statute by getting rid of the gun or concealing it.  In view of the discerned objective of section 12022.5, it is enough that the prosecution produce evidence of a gun designed to shoot and which gives the appearance of shooting capability.

Suppl. Answer at 7 (quoting People v. Jackson, 92 Cal. App. 3d 899, 902 (1979)).

In the instant case, the appellate court upheld the jury's findings regarding Petitioner's

44

possession and use of a firearm, and summarized the evidence in support of those findings as

follows:

> John Bailey described the gun as a large, silver automatic. He told the
> prosecutor he was familiar with guns because "I grew up in the ghetto. You see
> guns all the time." Bailey explained to the jury how an automatic gun operates
> and is loaded. He explained the difference between an automatic and a revolver,
> stating that a revolver has a round chamber in which the bullets are placed.
> Bailey testified that the gun pointed at his chest "looked real." When asked by
> defense counsel whether he could say with 'absolute certainty' that the gun was
> real, Bailey responded, "I thought it was a real gun. That's all I can say."
> Defense counsel again asked, but as you sit here under oath, can you say that it
> was, in fact, a real gun?" Bailey replied, "I couldn't possibly say if it was real or
> fake."
>
> Herbert Halcrombe was also familiar with guns and stated that he owns a
> .38 caliber revolver. He testified that [Petitioner's] gun appeared real and he
> believed it was a .45 automatic with a clip. It was not a revolver. Like Bailey,
> he explained to the jury the difference between an automatic and revolver. On
> cross-examination, defense counsel asked, "You don't know whether it was a
> replica, in other words something like a toy gun?" and Halcrombe responded,
> "No, I don't." Though less familiar with guns than Bailey or Halcrombe,
> Alwareeth too believed the gun was real.
>
> Even though no weapon was recovered, the testimony of the
> eyewitnesses provided a rational basis for the jury to conclude that the object
> observed was an actual gun, not a toy or replica. The mere possibility that the
> object seen by the witnesses may have been a sophisticated toy or replica does
> not necessarily create a reasonable doubt, nor were the People required to
> disprove that theoretical possibility. Substantial evidence supports the [gun-use]
> enhancement and the conviction for possession of a firearm.

Resp't Ex. B-2 at 16-17.

When viewed in the light most favorable to the prosecution, the evidence in Petitioner's

case was sufficient to allow any rational trier of fact to conclude that Petitioner committed the

crime of possession of a firearm by an ex-felon. See Jackson, 443 U.S. at 319. Contrary to

Petitioner's assertions, the Court finds that the witnesses' testimonies as to the fact that the gun

looked real, based on their familiarity with guns, was sufficient to establish Petitioner's liability.

See People v. Jackson, 92 Cal. App.3d at 899. Because the appellate court's ruling was not

unreasonable, this portion of Petitioner's claim is denied.

### b.   **Ammunition Possession**

Petitioner was also found guilty in the state court proceedings of possession of

45

ammunition (Cal. Penal Code § 12316(b)(1)).  Resp't A-1; CT 357.

Under California law, ex-felons are barred from possessing ammunition.  Cal. Penal Code § 12316(b)(1).  Constructive possession is established where it is shown that:

> the accused maintains control or a right to control the contraband; possession may be imputed when contraband is found in a place which is immediately and exclusively accessible to the accused and subject to his dominion and control, or the joint dominion and control of the accused and another.

People v. Johnson, 158 Cal. App. 3d 850, 854 (1984); see also People v. Palaschak, 9 Cal. 4th 1236, 1242 (1995).  This element may be established by "circumstantial evidence and any reasonable inferences drawn therefrom."  People v. Glass, 44 Cal. App. 3d 772, 774 (1975).

Petitioner argues that "[a]t the time of the search, not only was [Petitioner] away at jail, but there was a woman (unconnected to [Petitioner]) living in the apartment."  Pet'r Ex. 1 at 22. He further argues that there was no evidence that the ammunition was present in the apartment at any time Petitioner lived there.  Id.

In the instant case, the appellate court found sufficient evidence to support Petitioner's conviction for the crime barring ex-felons from possessing ammunition, stating:

> The evidence was sufficient . . . to support [Petitioner's] conviction for possession of ammunition.  [Petitioner] told Officer Joseph DeVille, during a contact in February 1998, that he lived at 731 Lucas Avenue, Apartment B. Officer Neal Newton testified that he had contacted [Petitioner] at that residence seven or eight times over the last three years.  Newton last contacted [Petitioner] there four to six months before [Petitioner] was taken into custody.  On May 5, 1999, one week after the incident at Foodsco [sic], Officer Newton saw [Petitioner] standing on a street corner one block from the Lucas Avenue residence.  When the studio apartment was searched, a week after [Petitioner's] arrest, police found approximately 45 rounds of .22 caliber ammunition in the closet along with men and women's clothing.  [T]hey found 16 rounds of live .308 caliber rifle ammunition in a cabinet.  In the cabinet was an envelope addressed to Mr. and Mrs. Carter postmarked April 17, 1999, and a prescription bottle with [Petitioner's] name on it, dated February 1999.  Moreover, [Petitioner] was in possession of a gun during the incident at Foodsco [sic].  In closing argument, defense counsel vigorously argued the lack of evidence tying [Petitioner] to the ammunition, suggesting to the jury that the ammunition could have been placed in the apartment after the [Petitioner] was taken into custody. The jury obviously rejected this argument.

Resp't Ex. B-2 at 18.

The evidence in Petitioner's case, when viewed in the light most favorable to the

prosecution, was sufficient to allow any rational trier of fact to conclude that Petitioner

committed the crime of an ex-felon in possession of ammunition.  See Jackson, 443 U.S. at 319.

The appellate court's denial of this claim was not an unreasonable application of clearly

established federal law.  28 U.S.C. § 2254(d).  Therefore, this portion of Petitioner's claim for

relief is also denied.

The appellate court's denial of Petitioner's entire insufficiency of evidence claim was not

an unreasonable application of clearly established Supreme Court precedent.  See 28 U.S.C. §

2254(d).  Accordingly, Petitioner is not entitled to habeas relief on this claim.

### E.   Improper Exclusion of Third-Party Culpability Evidence

#### 1.   Background

Petitioner argues that the trial court "erred in not allowing [Petitioner] to introduce

evidence establishing that at least one other identifiable person in the community closely

matched the description of the [suspect]," in violation of his "rights to a fair trial."  Pet'r Ex. 1 at

23-24.

The appellate court outlined the following background facts of Petitioner's claim of

improper exclusion of third-party culpability evidence:

> [Petitioner] sought to admit evidence that Danny Harris committed the crimes at
> Foodsco [sic].  According to [Petitioner], Harris had theft-related convictions,
> was African-American and about the same height, weight and age as [Petitioner],
> and also had a glass eye.  Additionally, Harris lived about three blocks from
> Foodsco [sic].  The court granted the People's motion to exclude the evidence,
> ruling that [Petitioner] had not demonstrated any evidence linking Harris to the
> commission of the theft.

Resp't Ex. B-2 at 19.

The appellate court found that the trial court did not abuse its discretion is excluding the

third-party culpability evidence.  In evaluating the evidence, appellate court stated:

> Harris'[s] similarity in appearance, prior record and [the] fact that he lived in the
> neighborhood does not constitute the required direct or circumstantial evidence
> linking a third party to the crime.  Defendant's comparison of the evidence
> regarding Harris with that in *People v. Cudjo* (1993) 6 Cal.4th 585 fails.  In
> *Cudjo*, a third party confessed to the crime within hours after its commission and
> under circumstances providing substantial assurance that the confession was
> trustworthy.  (*Id.* at pp. 609-610.)

47

1   Id.

2       **2.**  **Applicable Federal Law**

3      A state court's evidentiary ruling is not subject to federal habeas review unless the ruling

4   violates federal law, either by infringing upon a specific federal constitutional or statutory

5   provision or by depriving the defendant of the fundamentally fair trial guaranteed by due

6   process.  See Pulley v. Harris, 465 U.S. 37, 41 (1984); Jammal v. Van de Kamp, 926 F.2d 918,

7   919-20 (9th Cir. 1991); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985), cert. denied,

8   478 U.S. 1021 (1986).  The Due Process Clause does not guarantee the right to introduce all

9   relevant evidence.  See Montana v. Egelhoff, 518 U.S. 37, 42 (1996).

10      The exclusion of evidence does not violate the Due Process Clause unless "it offends

11   some principle of justice so rooted in the traditions and conscience of our people as to be ranked

12   as fundamental."  Id. at 43 (quoting Patterson v. New York, 432 U.S. 197, 201-02 (1977))

13   (internal quotations omitted).  Therefore, Petitioner must establish that his right to have the jury

14   consider the excluded evidence in the case was a "fundamental principle of justice."  See id.  "It

15   is not the State which bears the burden of demonstrating that its rule is deeply rooted, but rather

16   [Petitioner] who must show that the principle of procedure violated by the rule (and allegedly

17   required by due process) is so rooted in the traditions and conscience of our people as to be

18   ranked as fundamental."  Id. at 47 (quoting Patterson, 432 U.S. at 202) (internal quotations

19   omitted) (emphasis in original).

20

21      One of the fundamental rules that may be violated by the erroneous exclusion of critical,

22   corroborative defense evidence is the Sixth Amendment right to present a defense.  DePetris v.

23   Kuykendall, 239 F.3d 1057, 1062 (9th Cir. 2001) (citing Chambers v. Mississippi, 410 U.S.

24   284, 294 (1973), and Washington v. Texas, 388 U.S. 14, 18-19 (1967)).  "In order for evidence

25   of another suspect to be admissible . . . , there must be direct or circumstantial evidence linking

26   the third person to the actual perpetration of the crime.  Motive or opportunity is not enough."

27   Spivey v. Rocha, 194 F.3d 971, 978 (9th Cir. 1999) (upholding the California test on third-party

28   culpability evidence) (internal quotation marks omitted).

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

### 3.      __Analysis__

Petitioner argues that "because [the third-party culpability] evidence would have raised a reasonable doubt as to the identification of [Petitioner] as the thief, the trial court should have allowed its introduction, and the denial violated [Petitioner's] Federal due process rights to a fair trial."  Pet'r Ex. 1 at 24.

Respondent argues that the appellate court "properly found that [Petitioner] had failed to meet his burden of identifying any evidence actually linking Mr. Harris to the crimes."  Second Suppl. Answer at 3.

The Court finds that the trial court cannot be charged with failing to allow the presentation of evidence of third-party culpability because no such evidence linking the third party to the crimes was offered by the defense.  Therefore, the Court concludes that the appellate court's determination that Petitioner had failed to meet his burden of identifying any evidence linking Mr. Harris to the incident on April 28, 1999 was reasonable.  This interpretation is supported by the record:  (1) Petitioner's evidence -- that Mr. Harris had a similar appearance (including a glass eye) and lived near Foods Co. -- was properly excluded because it does not rise to the level of either "direct or circumstantial evidence linking [Mr. Harris] to the actual perpetration of the crime" in this case, Spivey, 194 F.3d at 978, and (2) there was sufficient evidence linking Petitioner to the crimes in question based on witnesses who were acquainted with him and who immediately identified him as the perpetrator when presented with the photographic lineup, RT 730-731, 791, 956, 959.  Therefore, the Court finds that the exclusion of the alleged evidence of third-party culpability did not amount to a due process violation because Petitioner failed to establish that his right to have the jury consider the excluded evidence in the case was a "fundamental principle of justice."  Egelhoff, 518 U.S. at 43.  Furthermore, even if the trial court's exclusion of this evidence amounted to constitutional error, such an error would not lead to a "substantial and injurious effect or influence in determining the jury's verdict," especially in light of the abundance of evidence pointing to Petitioner as the perpetrator of the crime and the lack of evidence implicating Mr.

49

Harris.  Brecht, 507 U.S. at 638.  Therefore, the appellate court's rejection of Petitioner's claim was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.  See 28 U.S.C. § 2254(d).  Accordingly, Petitioner's claim for habeas relief based on the exclusion of third-party culpability evidence is denied.

//

//

//

### CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED as to all claims.  The Clerk of the Court shall enter judgment and close the file.

IT IS SO ORDERED.

DATED:  9/26/05

SAUNDRA BROWN ARMSTRONG
United States District Judge

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

50